## W. A. DALLMEYER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19588.   Promulgated June 27, 1950.

*Elmer B. Hodges, Esq.*, for the petitioner.
*Marvin E. Hagen, Esq.*, for the respondent.

1284

OPINION.

HILL, *Judge*: Petitioner first contends that he is entitled under section 23 (k) (1) of the code to a business bad debt deduction of $9,233.53 in 1944, that being the alleged adjusted basis in his hands of the unsecured promissory notes of Cole Motor totaling $12,311.38 which he acquired from the Exchange National Bank in 1942. His second contention is that in 1944 he suffered a nonbusiness bad debt loss of $17,561.33 on loans he personally made to Cole Motor and therefore he is entitled under section 23 (k) (4) to deduct $1,000 in 1944 as a short term capital loss. Furthermore, he claims a $1,000 deduction in 1945 as a capital loss carry-over from the preceding year of the

unused portion of the $17,561.33 loss allegedly sustained in the prior year.

Thus, the first question for our determination is whether petitioner suffered a business bad debt loss in 1944 on the promissory notes of Cole Motor which he acquired from the Exchange National Bank in 1942. Respondent challenges the claimed deduction at the outset on the basis that the debts were nonbusiness in character and thus excluded from section 23 (k) (1). Respondent argues that petitioner did not make the oral guarantee, put up the collateral, and then take over the unsecured notes of Cole Motor held by the bank in settlement of any recognized legal liability. He contends that the loans were guaranteed in recognition of a purely moral duty, and such action did not constitute the carrying on of a trade or business. Petitioner, on the contrary, asserts that the acquisition of these unsecured notes from the bank and the loss that ensued proximately resulted from and was incurred in the carrying on by him of his business of being chief executive of the Exchange National Bank.

Section 23 (k) (1)[1] permits a full deduction for debts which become worthless during the taxable year, but it expressly excludes from the effect of its provisions, in the case of a taxpayer other than a corporation, a nonbusiness debt as defined in paragraph (4) of subsection (k). Paragraph (4)[2] was added by sections 124 (a) and 124 (d) of the Revenue Act of 1942 and defines a nonbusiness debt as a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from which is incurred in the taxpayer's trade or business.

It is clear that the unsecured notes which petitioner acquired from the bank were not evidenced by the kind of security defined in paragraph (3).[3] The question remains whether they were debts the loss from the worthlessness of which was incurred in petitioner's trade or business. Trade or business is not defined at any point in the code,

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*    *    *    *    *    *    *

(k) BAD DEBTS.

(1) GENERAL RULE.—Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection.

[2] (4) NON-BUSINESS DEBTS.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[3] (3) DEFINITION OF SECURITIES.—As used in paragraphs (1), (2), and (4) of this subsection the term "securities" means bonds, debentures, notes, or certificates, or other evidences of indebtedness, issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form.

but Regulations III, section 29.23 (k)–6, quoted in *Robert Cluett, 3rd,* 8 T. C. 1178, provides in pertinent part:

Sec. 29.23 (k)–6. NON-BUSINESS BAD DEBTS.—* * * The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section.

The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this section.

Similar reference is made to the proximate relationship between the debt and the business in which the taxpayer is engaged at the time it becomes worthless as well as to the close relationship between section 23 (k) (4) and section 23 (e) in the legislative history of the new provision. H. R. No. 2333, 77th Cong., 2d sess., p. 77.

Whether a debt is a nonbusiness debt within the meaning of section 23 (k) (4) so as to fall outside the scope of section 23 (k) (1) is a question of fact to be determined from all the circumstances. *Robert Cluett, 3rd, supra.* We think it plain that in the instant case the unsecured notes of Cole Motor acquired by petitioner were nonbusiness debts. We agree with petitioner that in 1944, the year of alleged bad debt loss, the performance of the duties devolving upon him as the executive head of the Exchange National Bank constituted the carrying on of a business. *Commissioner* v. *People's-Pittsburgh Trust Co.,* 60 Fed. (2d) 187, and *Ralph C. Holmes,* 37 B. T. A. 865. But we are convinced that there was no proximate relationship between the unsecured notes he acquired from the bank and his business at the time of the loss thereon, that of being chief executive of the bank. On the contrary, the oral guarantee of these notes, the furnishing of a $15,000 note as collateral therefor, and the subsequent acquisition of these notes was an isolated undertaking entirely separate and apart from the performance of his duties as chief executive. The evidence reveals no prior understanding between petitioner and the bank that he should guarantee loans recommended by the loan committee and petitioner himself admits that no legal liability rested on him at the time he made his guarantee. It is clear that petitioner guaranteed the unsecured notes of Cole Motor held by the bank to the extent of $15,000 only as a consequence of a compelling moral responsibility he felt. In this sense his action was purely voluntary

and outside the course of his business activities, even though he took this step as the result of criticism by the other directors.

Petitioner has cited us no authority for his assertion that his acquisition of the notes in question and the loss that ensued proximately resulted from and was incurred in the carrying on of his business as an officer and director of the bank. While we have found no cases bearing on this question since paragraph (4) was added to section 23 (k), yet the courts have decided against such a proposition on many occasions where a taxpayer has contended he was entitled to the closely related business loss deduction.

In *C. H. C. Jagels*, 23 B. T. A. 1041; affd., 72 Fed. (2d) 925, the president and director of a bank joined with six other directors in borrowing money with which to purchase from the bank at their full face value certain notes which were considered questionable by the bank examiner. Only a portion of the face value of the notes was ever collected. The debt on the loan by which the criticized notes were purchased was repaid, and the president, who had repaid part of that debt, claimed a deduction for a business loss. We held that the loss sustained was incurred in an isolated undertaking separate and apart from the taxpayer's usual and actual business.

In *William G. Park, Executor*, 22 B. T. A. 1263; affd., 58 Fed. (2d) 965, the president and director of a bank paid in a substantial sum to prevent closing of the bank when the treasurer embezzled a portion of the assets. He claimed a business loss arising out of the transaction. We said (p. 1266):

* * * a loss of this kind is not one incurred in trade or business, as it is not a part of the trade or business of the president and directors of a corporation to make good the latter's losses. * * *

In the recent case of *Friedman* v. *Delaney*, 171 Fed. (2d) 269, an attorney, to fulfill a moral obligation resulting from his assurances that money would be available to carry out a composition in bankruptcy for his client, deposited $5,000 of his own money with the clerk of the bankruptcy court. The court denied a claimed business loss deduction in the following language (p. 271):

Nor is the taxpayer in any better case [position] if he claims a deductible loss under Section 23 (e) (1). His was not a business loss made in carrying on a law practice. It is obviously no part of a lawyer's business to take on a personal obligation to make payments which should come from his client, unless in pursuance of a previous understanding or agreement to do so. The voluntary nature of the action, resulting in the loss, takes it outside of this Section. * * *

In view of these decisions, we conclude that there was no proximate relationship between the loss resulting from the alleged worthlessness of these Cole Motor notes in 1944 and the conduct of petitioner's business as president of the Exchange National Bank. It is possible for a taxpayer to engage in more than one business, but from the evidence we are not persuaded that petitioner's infrequent small loans to others

in addition to his son constituted a second business, and he does not contend otherwise. We therefore have found as a fact and now hold that the debts which petitioner acquired from the Exchange National Bank were nonbusiness debts expressly excluded from the provisions of section 23 (k) (1) and petitioner is therefore not entitled to the deduction claimed thereunder in 1944. Petitioner has not claimed a nonbusiness bad debt deduction under section 23 (k) (4) for the alleged loss on the notes under consideration and had he made such claim it would be of no avail, since, as shown below, he is allowed the full deduction for losses of this kind in respect of another debt.

The second question for our determination is whether petitioner was entitled to a deduction of $1,000 in 1944 under section 23 (k) (4) on a nonbusiness bad debt loss of $17,561.33 allegedly suffered in that year on loans which he personally made to Cole Motor prior to December 17, 1941. Respondent attacks petitioner's claim to the nonbusiness bad debt deduction on the ground that the unsecured notes petitioner held became worthless in some year prior to 1944 and thus had no value on January 1, 1944. He asserts that the adjudication of bankruptcy on October 28, 1943, was the identifiable event which established that the Cole Motor debts became worthless in 1943, if not before. Petitioner, on the other hand, contends that at no time prior to the year 1944 was there an identifiable event establishing with reasonable certainty the worthlessness of the Cole Motor notes. In his view the finding of the referee in bankruptcy on May 23, 1944, that the assets of the bankrupt were insufficient to pay the unsecured creditors anything, together with the allowance of the priority claims of the Unemployment Compensation Commission of Missouri in the total amount of $3,787.30, were the identifiable events establishing the worthlessness in 1944 of the loans he personally made to Cole Motor.

Petitioner has the burden of proving that the loans to Cole Motor actually became worthless in 1944, for by the 1942 amendment of section 23 (k) Congress changed the standard for the determination of worthlessness by substituting for the subjective test of ascertainment of worthlessness the objective test of actual worthlessness. If they became worthless prior or subsequent to 1944 petitioner was not entitled to a bad debt deduction. *Redman* v. *Commissioner*, 155 Fed. (2d) 319. Thus, petitioner must show that his loans had some intrinsic or potential value on January 1, 1944, *Dunbar* v. *Commissioner*, 119 Fed. (2d) 367.

It is well established that there is no fixed formula for determining the year in which a deductible loss was sustained. When and/or whether a debt became worthless is a question of fact, the answer to which does not lie in any stereotyped legal test, but in an examination of all the circumstances. *Lucas* v. *American Code Co.*, 280 U. S. 445, *Boehm* v. *Commissioner*, 326 U. S. 287. The date of worthlessness is

fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope for the future. *Joyce* v. *Gentsch*, 141 Fed. (2d) 891, *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398.

No general principle can be laid down as to the effect of an adjudication of bankruptcy on the right of an unsecured creditor to take a bad debt deduction. While oftentimes bankruptcy has been held to be the identifiable event which showed that a debt was entirely worthless, this is not inevitably so. See *Patten & Davies Lumber Co.* v. *Commissioner*, 45 Fed. (2d) 556. As respondent states in Regulations 111, section 29.23 (k)-1 (*b*) :

> \* \* \* Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt. In bankruptcy cases a debt may become worthless before settlement in some instances, and in others only when a settlement in bankruptcy shall have been had. In either case the mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, confirming the conclusion that the debt is worthless, will not authorize shifting the deductions to such later year. \* \* \*

In *P. H. Gill & Sons Forge & Machine Works*, 7 B. T. A. 1146, and *Taylor-Wharton Iron & Steel Co.*, 5 T. C. 768, we held that adjudication of bankruptcy alone was not sufficient to justify a bad debt deduction even though the debts were unsecured.

Thus we feel in the instant case the question of fact we must decide is whether, considering all the circumstances on January 1, 1944, there was a reasonable probability that no corporate assets of Cole Motor would be available for an unsecured creditor such as petitioner. If such a probability did not exist, then it could not be said petitioner's loans lacked intrinsic or potential value at that time. On the other hand, if at that date there was no reasonable practical basis for hope that petitioner would receive a return on his loans, then a deduction could not be taken for them in 1944.

It is true, as respondent points out, that a succession of events from 1937 through 1943 raised a question whether petitioner would receive any payment in course of the bankruptcy proceedings. From 1936 through 1941 Cole Motor suffered a net operating loss in each year. On December 17, 1941, this debtor filed a petition for reorganization under chapter X of the Bankruptcy Act. Secured claims against the company filed at this time totaled $52,835.70. In June, 1942, the plan of reorganization submitted by Cole Motor was rejected as unworkable. In 1942 the Exchange National Bank charged off a portion of its loans to Cole Motor and got rid of all the remaining unsecured notes of that company it held. In July of the following year the bank foreclosed its chattel mortgage on most of the rolling stock of Cole Motor. In October, 1943, the debtor was adjudicated bankrupt upon its failure to present a workable plan of reorganization. Despite these general unfavorable circumstances, we think the practical question whether some corporate assets would be available for unsecured creditors in

the bankruptcy proceedings depended on the value of the bankrupt's assets, the amount and validity of secured and priority claims filed, the costs of bankruptcy administration, etc. How much, if anything, petitioner would receive depended on such specific facts as these rather than on the financial history of the debtor which led to bankruptcy. See *Patten & Davies Lumber Co.* v. *Commissioner, supra,* p. 558.

The evidence makes it clear than on January 1, 1944, the above enumerated factors decisive of the question whether petitioner would receive any payment could not be determined with any degree of certainty. It is true that the total appraised value of the bankrupt's known assets as of December 6, 1943, was $23,237.50, but the report containing this information was not filed with the referee until January, 1944. A report by the trustee in bankruptcy dated January 3, 1944, stated that many miscellaneous claims, accounts, bills, papers, and related matter had to be segregated and collected before an intelligent report could be made as to the accounts of the bankrupt. The records of the debtor were so irregularly kept that it was impossible to estimate the value of all its assets before a prolonged investigation. The trustee later realized more on the accounts receivable than their appraised value. The latest available information concerning the debtor's assets existing at the close of 1943 was the amended schedule of assets filed by Cole Motor in February, 1942, showing their total value to be $74,566.75. Thus there was no current reliable estimate of the debtor's assets existing on January 1, 1944. Turning to secured and priority claims of creditors which take precedence over unsecured creditors in bankruptcy, no greater certainty existed concerning them on January 1, 1944. It is true that a total of $52,835.70 in secured claims were filed during the reorganization proceedings, but this gave no clue to the total amount of secured claims still unsatisfied or their validity at the time of bankruptcy. Similarly, it was impossible at the close of 1943 to estimate the total amount of priority claims which would be filed or their allowability, for such claims could be filed until June 12, 1944. The trustee disallowed a substantial portion of those which were first filed. The costs of bankruptcy administration could not be estimated with accuracy in December, 1943, so close on the heels of the adjudication.

No amount of investigation on the part of petitioner between October 28 and December 31, 1943, could have enabled him to form a reasonable estimate of the assets and liabilities of the bankrupt. The trustee was unable to ascertain their amounts with any exactitude until three or four months after his appointment on December 4, 1943. Not only were the records of the debtor in his possession confused, but he was unable to secure necessary data from the manager in possession of Cole Motor until March, 1944. We note that in *Patten*

*& Davies Lumber Co.* v. *Commissioner, supra,* and in *Richard Downing,* 43 B. T. A. 1147, the decisions emphasize that investigation at the time of the adjudication of bankruptcy proved the debt involved to be worthless in holding that the deduction was proper in the year of adjudication.

The evidence reveals a reasonable basis on January 1, 1944, for petitioner's hope that he would receive some payment from the bankruptcy proceeding. The trustee did not reach the conclusion that unsecured creditors would get nothing until early May, 1944. At the time of his appointment he believed more assets would be found than he later uncovered. The referee in bankruptcy did not announce that there would be no assets for unsecured creditors until May 23, 1944. His final report on July 1, 1946, shows that the secured claims filed and allowed were paid off in full and the bankrupt's assets failed to pay off priority claims filed and allowed by only $1,488.33. Had the priority claims of the Unemployment Compensation Commission of Missouri, which were allowed in the total amount of $3,787.30 in June, 1944, been disallowed, petitioner's hopes would not have proved groundless.

In view of the uncertain financial condition of the bankrupt on January 1, 1944, we are not persuaded that as a practical matter there was then a reasonable probability that no assets of Cole Motor would be available for unsecured creditors. We are convinced petitioner's loans had some intrinsic, potential value on that date. While the taxing act does not require a taxpayer to be an incorrigible optimist, neither does it require him to be an incorrigible pessimist. There is no evidence to show that petitioner did not act in entire good faith in claiming the bad debt deduction in 1944. As the court said in *Dunbar* v. *Commissioner, supra* (p. 370):

> * * * He [taxpayer] should not be penalized by any technical application of hard and fast rules in the assumption of the burden cast upon him to establish the precise time in which the loss occurred. It is a difficult burden at the best and, in the consideration of whether it has been met, he is entitled to that common sense, practical test suggested by the Supreme Court in *Lucas* v. *American Code Co.,* supra. * * *

We, therefore, have found as a fact and now hold that petitioner's loans to Cole Motor did not become worthless in 1943, but became worthless the next year. The identifiable event determining the worthlessness of the nonbusiness debts totaling $17,561.33 occurred in May, 1944, when the referee issued an order stating that unsecured creditors would receive no payment from the bankrupt. We therefore uphold petitioner's claim to a $1,000 deduction in 1944 on a non-business bad debt loss of $17,561.33 suffered in that year.

Finally, we hold that petitioner is entitled under section 117 (e) to a deduction of $1,000 in 1945 as a capital loss carry-over of the unused portion of the $17,561.33 loss suffered in the prior year.

*Decision will be entered under Rule 50.*