James L. Ruane, Sr., and Mary K. Ruane, et al. [1] v. Commissioner. Ruane v. Commissioner
Docket Nos. 61983, 62005-62007, 62061-62063. 58-175.
United States Tax Court
T.C. Memo 1958-175; 1958 Tax Ct. Memo LEXIS 49; 17 T.C.M. (CCH) 865; T.C.M. (RIA) 58175; September 23, 1958
*49 1. Petitioners were members of two partnerships. The first mined coal and manufactured coke. The second mined coal. All the coal mined by the first, and substantially all the coal mined by the second, was used by the first in its coking operations. Held, a representative field or market price of coal of like kind and grade as that used in the coke operations found for percentage depletion purposes. 2. Held, amounts expended by a partnership on reconditioning coke ovens and securing parts for coke machines represented capital expenditures and not deductible repair expenses. 3. A partnership made payments to one of its members which it accrued on its books as salary. It withheld Federal income and Social Security taxes on the amounts so paid. In computing its net income it deducted the amounts paid as a business expense, creating an operating loss. Held, the partnership is not entitled to deduct the amounts paid as a business expense. Held, further, in the absence of an agreement to the contrary, the excess of the salaried partner's withdrawals over his distributive share is presumed to be chargeable against his capital account, and not ratably against the capital accounts of all *50 the partners so as to entitle them to a deduction in computing their net income. 4. On the facts, held, petitioners have not established that certain advances made a partnership and its successor corporation became worthless during 1951. Norman D. Keller, Esq., and Kenneth P. Simon, Esq., for the petitioners in Docket Nos. 61983, 62005, 62006 and 62007. Thomas P. Ruane, Jr., Esq., 70 Kensington Avenue, Uniontown, Pa., for the petitioners in Docket Nos. 62061, 62062 and 62063. Donald W. Howser, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These *51 proceedings involve deficiencies in income tax and additions thereto in the amounts and for the years as set forth below. Addition to Tax
Docket
Sec.
No.
Petitioner
Year
Deficiency
294(d)(2)
61983
James L. Ruane, Sr., and Mary K. Ruane
1949
$ 9,559.04
1950
13,757.80
$ 802.48
1951
41,109.70
2,081.08
62005
Ralph X. and Mary E. Ruane
1951
5,155.60
62006
James L. Ruane, Jr., and Teresa W. Ruane
1951
5,300.26
62007
Estate of Martin W. Ruane, Deceased, et al.
1949
10,398.19
1950
15,608.30
805.28
1951
6,372.00
62061
Thomas P. Ruane, Jr.
1951
1,009.57
62062
Maurice J. and Margaret Ruane
1951
856.92
62063
Thomas P. Ruane, Sr., and Edna P. Ruane
1949
7,831.36
1950
14,718.98
858.06
1951
19,784.83
1,817.12
The issues are: (1) What was the representative field price of coal of like kind and grade as that mined by the Wynn Coal & Coke Company and the Wynn Construction Company which was used by Coal & Coke to manufacture coke during the years in issue; (2) whether the amounts expended by the Wynn Coal & Coke Company on its coke ovens were repair expenses deductible under section 23(a) *52 of the 1939 Code; (3) whether the amounts expended by the Wynn Coal & Coke Company on parts for its coke machines constituted repair expenses deductible under section 23(a) of the 1939 Code; (4) whether the partners of the R. & R. Coal Company are entitled to deduct their ratable share of purported salary payments made by it to one of its members; (5) whether a debt owing the R. & R. Coal Company became worthless during 1951; and (6) whether the amounts advanced by petitioners Ralph X. Ruane and James L. Ruane, Jr., to the Ross Construction Company became worthless during 1951. Concessions made with respect to other issues will be taken into account under a Rule 50 computation. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. During the years in issue, James L. Ruane, Sr. and Mary K. Ruane, husband and wife, resided in Connellsville, Pennsylvania; Ralph X. and Mary E. Ruane, husband and wife, resided in Uniontown, Pennsylvania; James L. Ruane, Jr. and Teresa Ruane, husband and wife, resided in Uniontown, Pennsylvania; Martin W. Ruane, who died May 9, 1951, resided in Farmington, Pennsylvania; *53 Thomas P. Ruane, Jr. resided in Uniontown, Pennsylvania; Maurice J. and Margaret Ruane, husband and wife, resided in Uniontown, Pennsylvania; and Thomas P. Ruane, Sr. and Edna P. Ruane, husband and wife, resided in Uniontown, Pennsylvania. The returns of all petitioners were filed with the former collector of internal revenue for the twenty-third district of Pennsylvania. Since the wives are before this Court solely by virtue of joint returns filed with their husbands, the husbands will hereinafter be referred to as the petitioners. Throughout the years 1949, 1950 and 1951, petitioners were members of two partnerships known as Wynn Coal & Coke Company (hereinafter referred to as Coal & Coke), and Wynn Construction Company (hereinafter referred to as Construction). At all times material hereto, Coal & Coke was engaged primarily in the business of manufacturing coke from coal. Some of the coal used by Coal & Coke in that process was obtained from deep mining operations which it conducted. The remainder was obtained from Construction which was engaged in the business of strip mining. The coal mined by Construction which was not delivered to Coal & Coke for its manufacturing operations *54 was sold by Construction on the open market. The properties on which Coal & Coke operated its deep mines were known as the Wynn property and the Redstone property. From the former it obtained Pittsburgh-Connellsville coal, and from the latter Sewickley coal. Pittsburgh-Connellsville coal was superior to Sewickley coal, and, in its raw state, commanded a higher price on the competitive market. In manufacturing coke, it was necessary to mix Sewickley coal with Pittsburgh-Connellsville coal in order to obtain an acceptable product. The properties on which Construction's strip mines were located were known as the Wynn strip and the Oliphant strip. The Wynn strip contained Pittsburgh-Connellsville coal and the Oliphant strip contained Sewickley coal. A portion of the coal mined from the Oliphant strip was unsuitable for coking purposes due to its proximity to the surface, and was sold by Construction for whatever price it could obtain. All the coal mined by Coal & Coke, and all the coal delivered to it by Construction was subjected to the treatment processes of cleaning, picking and crushing. During the picking and cleaning process, an average of 10 per cent of the Pittsburgh-Connellsville *55 coal and 20 per cent of the Sewickley coal was discarded as waste. Periodically, each partnership estimated the market value per ton of the coal it mined which was subsequently converted by Coal & Coke into coke. A base price was computed which was intended to represent the prevailing market for raw coal of the type being valued. That price was then increased by an amount corresponding to the percentage of waste experienced during the cleaning and picking operations. Finally, there was added an amount purportedly equal to the costs incurred during the cleaning, picking and crushing operations. The value so arrived at was utilized by each partnership in computing its gross income from mining for percentage depletion purposes. Set forth below are the tons of coal mined by Coal & Coke from its deep mine properties, the tons of coal mined by Construction from its strip mine properties which it delivered to Coal & Coke for coking, the values per ton estimated by each partnership for percentage depletion purposes, and the values per ton determined by respondent in his notices of deficiency for the taxable periods in issue. Part-
Respond-
nership
ent's
Value
Value
Year
Property
Tons
Per Ton
Per Ton
1949
Wynn Mine
59,059.35
$6.00
$5.15
Wynn Strip
13,225.50
5.25
5.15
Oliphant Strip
22,378.70
5.10
3.9427
1/1/50- 2/28/50
Wynn Mine
1,259.225
6.00
5.15
Wynn Strip
2,156.50
6.00
5.15
Oliphant Strip
173.35
5.10
3.9427
3/1/50-12/31/50
Wynn Mine
108,580.50
6.50
5.50
Wynn Strip
7,352.00
6.50
5.50
Oliphant Strip
44,040.65
5.60
4.1427
1/1/51- 5/ 8/51
Wynn Mine
52,763.65
6.50
5.15 *
Oliphant Strip
12,191.50
5.60
4.1427
5/9/51-12/31/51
Wynn Mine
98,741.50
6.50
5.50
Redstone
4,269.25
4.50
3.90
Oliphant Strip
40,729.80
5.60
4.1427
*56 At all times pertinent hereto, the Jamison Coal & Coke Company mined Pittsburgh-Connellsville coal from its #21 mine which was located within the geographical area under consideration. Before sale, that coal was picked for slate and refuse and was crushed. It was sold in both railroad car lots and in truck lots. All was invoiced as "crushed, run-of-mine coal." A major portion of that coal was sold for coking purposes. The prices obtained by Jamison Coal & Coke for its coal during the years in issue were as set forth below. Sales Price Per Ton
Railroad
Truck
Year
Car Load
Load
Average
1949
$5.16
$5.72
$5.22
1950
5.19
5.60
5.36
1951
5.26
5.91
5.69
Certain isolated sales of Pittsburgh-Connellsville coal in its raw state, made during the periods here under consideration in the area of petitioners' operations, occurred within the following price ranges per ton. Year
Price Range Per Ton
1949
$5.00 to $5.50
1950
5.50
1951
5.80 to 6.32
*57 Two isolated sales of Sewickley coal in its raw state were made in 1949 within the price range of $4.10 to $4.75 per ton. Based on the values per ton determined in his notices of deficiency and on certain uncontested adjustments to mining expenses and royalties paid, respondent recomputed the percentage depletion allowance for each partnership for the taxable periods in issue. As a result, he disallowed completely the deduction claimed by Coal & Coke for 1949; reduced Construction's claimed deduction for 1949; disallowed completely Coal & Coke's claimed deduction for 1950; reduced Construction's claimed deduction for 1950; reduced Coal & Coke's claimed deduction for 1951; and disallowed completely Construction's claimed deduction for 1951. The representative market or field price per ton for the years in issue of Pittsburgh-Connellsville and Sewickley coal, after subjection to the treatment processes of picking, cleaning and crushing, was not less than the amounts set forth below. Representative Field
Price Per Ton
Red-
Oli-
Wynn
stone
Wynn
phant
Year
Mine
Mine
Strip
Strip
1949
$5.50
$5.20
$5.00
1/1/50- 2/28/50
5.50
5.50
5.00
3/1/50-12/31/50
6.00
6.00
4.85
1/1/51- 5/ 8/51
6.00
4.85
5/9/51-12/31/51
6.00
$4.20
4.85
*58 Coal & Coke operated 230 beehive coke ovens during the years in issue. Those ovens were built in the shape of beehives and were joined together in single rows. All except the end units in each row had common adjacent walls. Each oven had a silica rock base, upon which stood a three-foot stone wall. The center of that wall was packed with fire clay, over which was laid fire brick. There was an opening in its top through which raw coal was dumped and smoke escaped. At the front of each oven, immediately above its base, was an arched door through which finished coke was extracted. During the course of normal operations, the extreme heat and the day to day use of the coke machines caused the oven walls to crack and break. Defects occurred gradually, until it became necessary to close the oven for reconditioning. Some eight to ten ovens were being reconditioned at all times. Prior to the taxable periods in issue, Coal & Coke retained a maintenance crew whose function it was to recondition the ovens which had fallen into various stages of disrepair. Dependent upon its use, an oven was reconditioned every three to four years. In 1950, Coal & Coke contracted with the Fayette Construction *59 Company to recondition sixty of its ovens. It was understood that Coal & Coke would furnish the necessary materials. Pursuant to that agreement, Fayette Construction rebuilt a complete front wall and crown in each oven and relined it with fire brick. In some instances, the side walls were also rebuilt. Coal & Coke paid Fayette Construction $15,300 for that work. In computing its net income for 1950, Coal & Coke deducted the amount so expended as an ordinary business expense. Respondent disallowed that deduction in full. At all times pertinent hereto, Coal & Coke used Covington coke machines to extract coke from its ovens and to load it onto waiting railroad cars. The functions of extraction and loading were performed by separate units of the same machine. The extractor unit rested on a truck consisting of a cast iron frame and four wheels. The loading unit, composed primarily of a system of conveyor belts, rested on a similarly constructed truck frame. Due to the vibrations and shocks of normal usage, both the extractor and conveyor trucks became broken, and had to be replaced. During 1950, Coal & Coke replaced two extractor truck frames and one set of wheels at an aggregate cost *60 of $6,616. It also replaced, during that year, one conveyor truck frame at a cost of $1,885. In computing its net for 1950 Coal & Coke deducted the amounts so expended as an ordinary business expense. Respondent disallowed that deduction in full. During the years 1949 and 1951, petitioners James L. Ruane, Sr., James L. Ruane, Jr., and Ralph X. Ruane, along with Paul B. Ross, were members of a partnership known as the R. & R. Coal Company, which was engaged in the business of mining coal. The Ruanes shared in partnership profits and losses to the extent of 16 2/3 per cent each. In addition to being a partner, Ross served the partnership in a full-time managerial capacity. Petitioners participated in the management of the business only on a part-time basis. During the calendar year 1949, R. & R. Coal Company accrued on its books as salary and paid to Ross the amount of $3,510. During the calendar year 1951, it similarly accrued as salary and paid Ross the amount of $6,440. It withheld Federal income and Social Security taxes from the amounts paid Ross. In computing its net income for those years, it deducted the payments made Ross as partnership operating expenses, creating an operating *61 loss. Respondent determined that the R. & R. Coal Company was not entitled to deduct those salary payments in computing its net income for the years in issue. Ross Construction Company (hereinafter referred to as Ross partnership) was a partnership engaged in the construction of highways. Petitioners James L. Ruane, Sr., James L. Ruane, Jr., and Ralph X. Ruane were partners in that business. From July 1946 to April 7, 1949, petitioners Ralph X. Ruane and James L. Ruane, Jr., at the request of their father James L. Ruane, Sr., each advanced $8,866.66 to the Ross partnership. Those advances were made with the expectation of repayment. On April 15, 1949, the Ross Construction Company (hereinafter referred to as the Ross corporation) was organized to succeed to the business previously conducted by the Ross partnership. No stock in that corporation was issued to either Ralph X. Ruane or James L. Ruane, Jr. On January 10, 1951, the Ross corporation filed a petition for reorganization under Chapter X of the National Bankruptcy Act in the United States District Court for the Eastern District of Tennessee. From the date of the Ross corporation's organization to the date of its filing *62 for reorganization under Chapter X, the R. & R. Coal Company loaned the Ross corporation the amount of $90,225.12. It filed a claim in the Chapter X proceeding for the amount of that advance. No part of that claim has been satisfied. In its petition under Chapter X, the Ross corporation disclosed assets of $663,000, liabilities of $455,000, and alleged that inability to collect accounts prevented it from meeting its debts as they matured. A trustee was appointed, and in a report of February 28, 1951, expressed the opinion that the Ross corporation was "amply solvent," having appraised assets of $891,639.54 and liabilities of $450,000. He recommended the business be continued in modified form, the corporation to be allowed to engage in the renting of its construction equipment. On July 7, 1951, a sale of certain equipment was held to satisfy creditors' claims of $104,000. The only purchasers were preferred creditors who purchased the pieces of equipment upon which they then held liens. Prior to that sale the corporation's equipment had been valued at $688,199.80. Subsequent thereto, that equipment was valued at $400,000. By virtue of that sale, its debts were reduced to $355,000. *63 Thereupon, the trustee commenced rental of the corporation's remaining equipment. On July 30, 1951, a proposed plan of reorganization was filed whereby the corporation's property was to be returned, and it was to be permitted to continue operations through the collection of receivables, and the renting, selling and repairing of its equipment. That plan, in modified form, was approved on September 12, 1951. On February 25, 1952, the trustee submitted a new plan of reorganization, modified on May 21 of that year, contemplating the merger of the Ross corporation and the Macon Stone Company. Macon Stone was a company which was indebted to the Ross corporation in an amount in excess of $40,000. It was hoped with that merger, and with certain practical improvements to Macon Stone, that the earnings of the Ross corporation would be bolstered to an extent which would permit the eventual satisfaction of its creditors. On June 5, 1952, with certain amendments, the Court confirmed the modified plan. The R. & R. Coal Company, Ralph X. Ruane, and James L. Ruane, Jr. agreed to subordinate their claims against the Ross corporation to that of other creditors as long as any, or all of the above-mentioned *64 plans of reorganization were in operation. In computing its net income for the year 1951, the R. & R. Coal Company claimed a bad debt deduction for the $90,225.12 which it had advanced the Ross corporation. On their returns for 1951, petitioners Ralph X. Ruane and James L. Ruane, Jr. each claimed a capital loss in the amount of their advances to the Ross partnership. Respondent disallowed in full each of those deductions. The advances made to the Ross corporation and the Ross partnership by the R. & R. Coal Company and Ralph X. Ruane and James L. Ruane, Jr., respectively, did not become worthless during 1951. Opinion The first issue for consideration is the proper depletion base for the coal mined by Coal & Coke and Construction which was used by the former in its coking operations. For the taxable years 1949 and 1950, the percentage depletion allowance with respect to coal as provided by section 114(b)(4)(A) of the 1939 Code was 5 per cent of the gross income from the property, excluding rents and royalties, but not to exceed 50 per cent of the net income from the property. For the *65 taxable years 1951, that allowance was increased to 10 per cent. Subparagraph (B) defines gross income from the property as "the gross income from mining * * *," and includes within the term mining "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *." In the case of coal, those processes are cleaning, breaking, sizing, and loading for shipment. The parties agree that the commercially marketable mineral product for the purposes of this proceeding was the coal mined by Coal & Coke and Construction after subjection to the treatment processes of cleaning, picking and crushing. Had all the partnership sales been of coal as so treated, this issue would not exist. However, such was not the case. The coal mined by each partnership was further processed by Coal & Coke in its manufacturing operations and sold as coke. It is that coal with which we are concerned. The applicable regulations state: [2]
"If the taxpayer sells *66 the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is * * * processed (other than by the ordinary treatment processes * * *) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product. * * *" As set forth more fully in our findings, each partnership periodically estimated the market value of the coal mined by it which was sold subsequently as coke in the finished product state. It is the amounts so arrived at that petitioners now contend constituted "the representative market or field price * * * of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes [which the partnerships] actually applied * * *." Respondent, on the other hand, determined that the "representative market or field price" for the coals in issue was substantially less than that contended *67 for by petitioners. Consequently, he eliminated in some years, and reduced in others, the percentage depletion allowances claimed by each of the partnerships. In addition, his determination reduced Coal & Coke's cost of goods sold, with respect to the coal received from Construction, and decreased Construction's gross receipts with respect to that coal. The question is one of fact. The parties have presented evidence of what they consider to be sales of coals of like kinds and grades made within the area of operations here in issue. As might be expected there is divergence between the prices obtained. Exercising our best judgment based on the record as a whole we have made findings of fact which are dispositive of this issue. In 1950, Coal & Coke expended $15,300 for reconditioning sixty of its coke ovens, and $8,501 in securing parts for its coke machines. It is contended by petitioners that those constituted repair expenditures deductible under section 23(a)(1)(A) of the 1939 Code. Respondent, on the other hand, maintains they represented the cost of replacements and therefore should have been capitalized. The issue is factual. Home News Publishing Co., 18 B.T.A. 1008 (1930). *68 Regulations 111, section 29.23(a)-4 distinguishes between repairs and capital expenditures in the following manner: "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, providing the plant or property account is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve if such account is kept. * * *" Applying those distinctions to the instant case, we hold that the $15,300 expended for reconditioning the coke ovens was not deductible as a repair expenditure but should have been capitalized. The work performed on the ovens appreciably prolonged their life and, in fact, gave them a new life. According to normal experience, an oven would last from three to four years. It then fell into such a state of deterioration, that it became necessary to shut it down for *69 renovation. As a result of the work performed the oven was substantially rebuilt, thereby obtaining a new life expectancy of three to four years. In the light of these facts we are of the opinion that the work performed by Fayette Construction during 1950 cannot be classified as incidental repairs, and that respondent properly disallowed the deduction taken for this item. With respect to the amounts expended by Coal & Coke on parts for its coke machines, the record is far from satisfactory. Its office manager testified that to the best of his knowledge the only coke machines in existence were some 35 to 40 years old, and that the practice had been to merely keep them in operating condition. He further testified that "these frames" last on an average of two years, though some break within one year and others last longer than two years. He gave a general description of the coke machine, its function and the manner in which the frame breakages occur. Other than that, the record is silent as to this item. We are of the opinion that petitioners have failed to demonstrate error in respondent's determination that the amounts expended by Coal & Coke for parts for its coke machines represented *70 capital expenditures, and his determination is therefore sustained. The next issue involves the purported salary payments made by the R. & R. Coal Company to Paul Ross during 1949 and 1951. Originally, petitioners took the position that the partnership was entitled to deduct those payments as an operating expense in computing its net income. Now, however, they concede that such was not the case. Their present position is that where, as here, partnership withdrawals exceed profits, and a guaranteed salary payment is authorized to be made one of the partners, the non-salaried partners are entitled to deduct as a business expense a proportionate share of the salary so paid in computing their individual net income. In support of that position they rely primarily upon G.C.M. 6582, VIII-2 C.B. 200. Respondent accepts petitioners' statement of the law as correct; however, he maintains the record here is insufficient to support its application. He argues that it has not been established that the partners of the R. & R. Coal Company intended that the payments to Ross should be treated as a business expense in the calculation of partnership profits and losses. Therefore he contends *71 such payments must be presumed to have been advance withdrawals of anticipated profits, chargeable against Ross's capital account to the extent they exceeded his distributive share of partnership profits. While there exists some doubt as to whether this issue was properly raised, in the absence of any objection on respondent's part, and in view of our ultimate result, we have considered it. For income tax purposes, salary payments made to a partner are considered to be a part of his distributive share of partnership net income. Estate of S. U. Tilton, et al., 8 B.T.A. 914 (1927). Hence, they are not deductible by a partnership in computing its net income. Augustine M. Lloyd, 15 B.T.A. 82 (1929). [3] But where guaranteed salary payments made to a partner exceed partnership earnings, to the extent of that excess, they are considered to have been derived proportionately from each partner's capital account. Therefore, to the extent that a partner's account has been depleted to meet the salary payments made to another partner, he is considered to have incurred an ordinary *72 and necessary business expense deductible in computing his own net income. Augustine M. Lloyd, supra.It is this deduction which petitioners now claim. It is well settled in Pennsylvania that, in the absence of an agreement to the contrary, a partner is not entitled to compensation for services rendered a partnership beyond his share of partnership profits, Rosenfeld v. Rosenfeld, 290 Pa. 39, 133 A. 2d 829 (1957). Therefore, withdrawals made by a partner, whether termed salary or not, in excess of his distributive share of partnership profits would be chargeable against his capital account, unless otherwise agreed to by the partners. Especially would that be true where, as here, those withdrawals exceeded partnership profits for the year. It was necessary that petitioners show that the payments received by Ross represented guaranteed payments of salary which the other members of the firm had agreed were to be treated as a business expense in the determination of partnership *73 profits and losses. That they failed to do. The record discloses that Ross was "authorized to draw a salary from the R. & R. Coal Company," which, however, was not withdrawn in all instances "because we didn't have it." The record further reveals that the partnership erroneously withheld Federal income and Social Security taxes on the amounts withdrawn by Ross. On these facts, we are unable to conclude that the payments received by Ross represented guaranteed salary payments authorized by the members of the partnership, which were to be treated as a business expense in calculating partnership profits and losses. Actually, it would seem more likely, in light of the fact that the salary was not withdrawn at all times, that the payments were to be made only from profits. If that were the case then the excess would be chargeable to Ross's capital account and not the accounts of the other partners. Respondent is sustained on this issue. Petitioners next contend that the amount of $90,225.12, representing advances made by the R. & R. Coal Company to the Ross corporation, and the amounts advanced by Ralph X. Ruane and James L. Ruane, Jr., to its predecessor partnership, became worthless *74 during 1951 and were deductible by them in computing their net income for that year. They maintain that the economic status of the debtor as of the close of 1951 was such that there existed no reasonable expectation of ultimate recovery of any part of the amounts so advanced. Respondent, on the other hand, maintains that bankruptcy alone does not justify a bad debt deduction. He claims the controlling factor is whether, under the circumstances presented, there exists a reasonable possibility of recovery by the creditor. He argues that petitioners have not shown that the Ross corporation was insolvent as of the close of 1951. To the contrary, he maintains that the record indicates that as of the critical date its assets exceeded its liabilities, and further that the parties themselves were optimistic about the corporation's eventual recovery. In any event, he claims that the amounts advanced by R. & R. created at most a non-business bad debt, the loss from which must be treated as a short-term capital loss whenever it occurs. He further submits that petitioners have not proven that the advances made by Ralph X. and James L. Ruane, were anything more than capital investments. *75 Whether or not a debt has become worthless is a question of fact, and depends primarily upon the reasonable probability of its ultimate collection. While the cases speak of identifiable events, those events often are nothing more than a combination of circumstances which give rise to reasonable grounds for the abandonment of hope for future recovery of the loans. Thus it is with bankruptcy. It is true that bankruptcy generally may be taken to be an indication of the worthlessness of at least a part of an unsecured debt, however the creditor has the burden of proving that there was at the time no reasonable basis for expecting any return of his advances. Regulations 111, section 29.23(k)(1); Giles E. Bullock, 26 T.C. 276 (1956), affirmed 253 Fed. (2d) 715 (C.A. 2, 1958); W. A. Dallmeyer, 14 T.C. 1282 (1950). In such circumstances the question narrows itself to whether or not, in the light of the debtor's financial status, some corporate assets would be available for the unsecured creditor in the bankruptcy proceedings. W. A. Dallmeyer, supra.
In the instant case there was no *76 proof that the Ross corporation was bankrupt, or for that matter even insolvent, as of the close of 1951. In point of fact, a review of the record convinces us that the proceedings under Chapter X had been initiated in an attempt to straighten out its affairs so that it could eventually meet its financial obligations. See Giles E. Bullock, supra.The trustee's reports, and the submitted plans of reorganization, all seem to indicate optimism on the part of those concerned that ultimate satisfaction of creditors could be accomplished. After a review of the record as a whole, we are of the opinion that as of December 31, 1951, neither the petitioners nor the R. & R. Coal Company had reasonable grounds for abandoning hope for the ultimate recovery of all or part of their advances to the Ross corporation. We have therefore found as a fact that those debts did not become worthless during 1951. We note that in arriving at this conclusion we have assumed, but not decided, that the advances made by the individual petitioners constituted loans, and not capital investments. Moreover, in the light of our disposition of this matter, we need not consider respondent's contention that *77 the advances made by the R. & R. Coal Company created business bad debts. We find no merit in petitioners' argument to the effect that the sale of some $288,000 of the debtor's equipment for only $104,000 supports an inference that the appraised value of the corporation's assets was far in excess of their fair market value. It appears from the record that the only purchasers at that sale were preferred creditors who merely purchased the equipment upon which they then held liens. In the light of such circumstances we cannot conclude that appraised value of the remaining corporate assets was unrealistic. Petitioners originally raised an issue with respect to respondent's disallowance of deductions claimed by them for their distributive shares of a purported operating loss sustained by the Ross partnership during the year 1949. In the absence of partnership books and records an attempt was made at trial to reconstruct the partnership's income through the use of secondary evidence. Respondent objected on the grounds that it was not the best evidence. That objection was sustained. Petitioners have not argued the issue on brief, and we therefore deem it to have been abandoned. Decisions *78 will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Ralph X. Ruane and Mary E. Ruane, Docket No. 62005; James L. Ruane, Jr., and Teresa W. Ruane, Docket No. 62006; Estate of Martin W. Ruane, Deceased, John L. Spurgeon, Executor, Docket No. 62007; Thomas P. Ruane, Jr., Docket No. 62061; Maurice J. Ruane and Margaret Ruane, Docket No. 62062; Thomas P. Ruane, Sr., and Edna P. Ruane, Docket No. 62063.↩
*. Though the notices of deficiency and stipulation recite that respondent determined a value of $5.15 per ton for this coal, the deficiency is computed on the basis of a value of $5.50 per ton.↩
2. Regulations 111, section 29.23(m)-1(f)↩.
3. But see section 707(c) of the 1954 Internal Revenue Code↩.