LONNY E. AND GLENDA ADAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Adams v. Commissioner
Docket No. 48958-86
United States Tax Court
T.C. Memo 1990-478; 1990 Tax Ct. Memo LEXIS 523; 60 T.C.M. (CCH) 689; T.C.M. (RIA) 90478; September 4, 1990, Filed *523 Decision will be entered under Rule 155. Brent R. Armstrong, for the petitioners. Joel A. Lopata, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 81,501 in petitioners' Federal income tax for 1981 and an addition to tax of $ 20,375 under section 6651(a)(1). [1]
After concessions, the issues remaining for decision are: (1) whether petitioners are entitled to an $ 85,000 business bad debt deduction claimed on Schedule C of their 1981 joint income tax return, and (2) whether petitioners are liable for an addition to tax under section 6651(a)(1) for failure to timely file their 1981 return. In deciding whether petitioners are entitled to the claimed business bad debt deduction, we first must decide whether petitioners reported as part of their 1980 income the face amount of an $ 85,000 note of H. Kay Chandler (Chandler) received indirectly by petitioner Lonny E. Adams (Adams) in partial payment of a real estate commission due *524 him by Western Woodlands, Inc. (Western Woodlands), thereby establishing a basis for the claimed business bad debt, and if so, whether the $ 85,000 Chandler note became worthless in 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Kaysville, Utah, when they filed their petition. They filed a joint income tax return for 1980 on February 8, 1984, and a joint income tax return for 1981 on March 20, 1984. The facts are involved. Briefly stated, Adams owed his sister Marcene Haacke (Haacke) $ 85,000; Western Woodlands owed Adams $ 85,000; and Chandler owed Western Woodlands $ 85,000. The debt from Chandler to Western Woodlands was secured by an assignment of a Trust Deed and a Trust Deed Note. On October 23, 1979, an agreement was entered into whereby inter alia Western Woodlands assigned its interest in the Trust Deed Note and the Trust Deed to Haacke, and Chandler agreed to make payments under a new note directly to Haacke. Adams agreed that he would remain liable on his debt to his sister in the event Chandler did *525 not satisfy his obligation under the note. Chandler made three payments of $ 700 each on the note, in November 1979, December 1979, and January 1980. There is a dispute as to whether petitioners included the face amount of the $ 85,000 Chandler note in their income, thus establishing a basis for a business bad debt which petitioners claimed on their 1981 tax return. Western Woodlands
Western Woodlands was a real estate brokerage firm. Adams was its sole stockholder and president. In 1976, he pledged all of his stock to two real estate developers, Eugene Kimball (Kimball) and Keith E. Garner (Garner), as security for their investment in the corporation. Kimball and Garner subsequently took over operating control of Western Woodlands; however, Adams remained its president. Due to disputes between Adams, on the one hand, and Kimball and Garner, on the other, by the end of 1978, Western Woodlands ceased active operations and began to wind down its affairs. Adams then became self-employed in the business of development and sale of real estate. Prior to 1979, Western Woodlands and Adams jointly developed and marketed numerous real estate projects with Kimball and Garner. Western *526 Woodlands (through Adams) would find a site, and provide marketing services; Kimball and Garner would arrange for the financing and construction of the project. Eighteen such projects were completed. One such project was Colonial Square in Bountiful, Utah, which was to be a 10-acre commercial shopping center, subdivided with building sites to be sold to individual proprietors who would construct their own buildings. Pursuant to a Marketing Agreement dated June 25, 1976, between Kimball and Western Woodlands, the latter was to provide sales and marketing services for the Colonial Square project. For its services, Western Woodlands was to receive 50 percent of the total cash amount paid as a down payment toward the purchase of a lot or 10-percent commission for the sale of all property. It was originally intended that Western Woodlands' remuneration would be in cash and contracts. Chandler and his wife, Phyllis Chandler, purchased a lot in the Colonial Square project and gave Kimball a note for $ 85,000, payable both to him and Mrs. Kimball, and a Trust Deed dated March 17, 1977, to secure the note, with the Kimballs as beneficiaries. The Trust Deed was subordinate to a lien (a *527 first trust deed) of First Security Bank on the property. (At the time the Chandlers purchased the lot, Chandler was co-owner of Chandler Drug and Gift in Clearfield, Utah, and was trying to expand his business. However, because of financial problems with his business, he subdivided his Colonial Square property and leased the newly acquired space.) Kimball assigned all beneficial interests and rights accrued under the Trust Deed and Trust Deed Note to Western Woodlands by an assignment of trust deed dated July 6, 1978. The assignment was for partial payment of commissions due Western Woodlands by Kimball. Adams was to receive certain payments from Western Woodlands in partial payment of commissions due him. Western Woodlands wanted to transfer the Trust Deed and Trust Deed Note to Adams in satisfaction of its obligation. However, in order to facilitate payments to Haacke on Adams' $ 85,000 debt to her, Adams requested that Kimball and Garner transfer the Trust Deed and Trust Deed Note to Haacke. The request was granted, and on July 6, 1978, Western Woodlands assigned to Haacke all beneficial interests and rights accrued under the Trust Deed and Trust Deed Note. To accomplish *528 said triangular arrangement, Adams, Chandler, and Haacke entered into an agreement, apparently prepared in July 1977, but dated October 23, 1977. The Chandlers executed another promissory note dated October 16, 1979, as a substitute for the Trust Deed Note, in which they agreed to pay Haacke $ 85,000. Pursuant to the agreement, Adams acknowledged "that in the event of the inability of H. Kay Chandler and Phyllis Chandler to pay the indebtedness to Haacke that he, Lonny E. Adams, will remain liable therefor." The Chandlers agreed that in the event they default on the note, they would assign their interests (subject to liens thereon) in the Colonial Square property to Adams. The Chandler debt payable to Haacke is the debt at issue. Adams remained liable on his debt to Haacke. It was understood that in the event of default by Chandler on his note to Haacke, Adams (rather than Haacke) would pursue Chandler. The Chandlers made three payments of $ 700 each on the $ 85,000 note, in November 1979, December 1979, and January 1980. When Haacke notified Adams that Chandler ceased making the necessary payments, Adams undertook collection efforts against Chandler; said efforts were unsuccessful. *529 Haacke made no attempt to collect on the note. Nor did she claim the Chandler obligation as a bad debt deduction on any of her Federal income tax returns. During the summer of 1980, First Security Bank foreclosed on its first trust deed on the Chandler lot in Colonial Square. Chandler abandoned his investment in Colonial Square in 1980 because it was unprofitable. Had Adams pursued Chandler by legal action in 1980, he might have been able to collect something, because at that time Chandler had income from his drugstore. As of the beginning of 1981, Adams had hopes of collecting on the note; but by December 1981, Chandler had shut down his business and had few assets with which to satisfy the many demands of his creditors. Chandler sold all the assets of his business. The sale did not provide sufficient funds to pay off his debts. Chandler became insolvent; in addition to the balance owed on his $ 85,000 note to Haacke, he owed unsecured creditors $ 223,000. If Adams had pressed Chandler for the $ 85,000, Chandler would have filed for bankruptcy. Following the closing of his business, Chandler began working at the Hill Air Force Base earning $ 17,000 a year. The February 1980 *530 Settlement and the Subsequent Litigation
Adams did not file legal action against Chandler to collect on the note because he was concurrently involved in efforts to collect commissions owed him and Western Woodlands by Kimball and Garner. In 1980, the dispute between Adams and Western Woodlands, on the one hand, and Kimball and Garner, on the other, was submitted to arbitration and settled. Pursuant to the settlement, agreed to in February 1980, Kimball and Garner transferred property, notes, contracts and other rights to Western Woodlands. After the February 1980 settlement was reached, Kimball and Garner were sued by Jim Burgess (Burgess) and Gordon Sloane (Sloane), former business associates of Adams in Western Woodlands who were not included in the February 1980 settlement, to collect funds owed them. Kimball and Garner made a counterclaim against Western Woodlands to set aside the property and notes transferred to Western Woodlands (including the Chandler note) pursuant to the February 1980 settlement and for $ 10 million in punitive damages. Adams thereafter joined Burgess and Sloane in their suit against Kimball and Garner. That litigation continued until the fall of 1983, *531 with Kimball and Garner prevailing. Petitioners' 1980 and 1981 Federal Income Tax Returns
Because petitioners' rights to several significant items of potential income were being disputed in the litigation with Kimball and Garner, including both cash and non-cash items, petitioners were unable to prepare and file accurate Federal income tax returns for 1980 and 1981 until the litigation was terminated. Apart from such items, and except for approximately $ 3,000 in wages which Glenda Adams earned as a part-time schoolteacher, petitioners had no income for 1980 and 1981. Both Adams and Western Woodlands used Tebbs, Smith & Associates, Certified Public Accountants (CPAs) beginning in 1978 to prepare their tax returns. Petitioners obtained an extension of time for filing their 1981 Federal income tax return. After the litigation ended in the fall of 1983, Alfred Kofoed (Kofoed) and Bruce M. Teran (Teran) of Tebbs, Smith & Associates proceeded to complete the compilation work and prepared petitioners' 1980 and 1981 returns. The returns for both years were prepared simultaneously. (Kofoed and Teran have been certified public accountants for 15 and 13 years, respectively. At the time *532 of trial, they had not been fully paid for the work they performed for petitioners.) The accountants' workpapers which documented petitioners' income and deductions for 1979 and 1980 were inadvertently destroyed in 1987 as part of the routine in the accounting firm's office for handling old files. (The firm regularly disposed of its files of matters relating to years bearing dates beyond the statute of limitations. The documents pertaining to the 1980 return, even though prepared in 1984, were inadvertently destroyed because of the 1980 date.) Although the workpapers were destroyed, the CPAs believe the Chandler note was included in petitioners' income in 1980, prior to the year the bad debt deduction was claimed. In 1980, the Internal Revenue Service began a criminal investigation of Adams concerning an earlier tax year which was later terminated without any charges being filed. Because of this criminal investigation, petitioners and their CPAs were aware that the 1980 and 1981 returns would most likely be audited immediately after they were filed. Thus, the CPAs took extra efforts to verify the accuracy of petitioners' tax returns. Further, since bad debt deductions are frequently *533 audited items, Teran took extraordinary measures to make sure the deduction was properly taken. The Internal Revenue Service, through one of its revenue agents, was in constant contact with petitioners and their CPAs from 1980 through 1983. When the 1980 and 1981 returns were filed in 1984, a revenue officer of the Collection Division of the Internal Revenue Service reviewed the returns but made no objections to their contents. Before petitioners' 1981 tax return was filed, it was reviewed by an Internal Revenue Agent who requested that a letter be obtained to prove that the Chandler note was worthless in 1981. Such a letter was obtained from attorney David E. Bean, of Bean & Smedley, which describes Chandler's debts and his inability to pay his obligation. Teran relied on the letter to establish that the $ 85,000 note became worthless in 1981. ULTIMATE FINDINGS OF FACT 1. Petitioners included the face amount of the $ 85,000 note executed by Chandler on their 1980 Federal income tax return as business income. This established a basis for the bad debt deduction claimed on their 1981 return. 2. The Chandler note became totally worthless in 1981. Petitioners are entitled to deduct *534 the note as a business bad debt in that year. 3. The late filing of petitioners' 1981 Federal income tax return was due to reasonable cause. OPINION I. Claimed Business Bad Debt Deduction
Petitioners contend that (1) a basis for the business bad debt deduction was established in 1980, and (2) the debt became worthless in 1981 and was properly claimed for that tax year. Respondent, on the other hand, contends that petitioners had no basis for the claimed business bad debt. He further asserts, assuming arguendo that a debt did exist, that petitioners failed to prove that the debt became worthless during the 1981 taxable year. We agree with petitioners that they are entitled to a business bad debt deduction in the amount of $ 85,000 for 1981. The $ 85,000 Note was Included in Income on Petitioners' 1980 Return
Notes or other evidence of indebtedness received in payment for services constitute income in the amount of their fair market value at the time of transfer. Sec. 1.61-2(d)(2), Income Tax Regs. In Kingsbury v. Commissioner, 65 T.C. 1068, 1091 (1976), we held that the fair market value of a negotiable promissory note of a responsible and solvent maker is includible in income in *535 the year of receipt, whether or not actually paid in that year. Section 166(a)(1) provides for deductions against ordinary income for business bad debts that become worthless within the taxable year. A deductible bad debt must arise from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. Here, the record establishes that such a relationship existed between Adams and Western Woodlands. Under section 1.166-1(e), Income Tax Regs., worthless debts arising from unpaid wages and salaries are permitted as a deduction under section 166 only if the income such items represent has been included in the return of income for the year for which the deduction as a bad debt is claimed or for a prior taxable year. Since the workpapers used to prepare petitioners' 1979 and 1980 tax returns were inadvertently destroyed by clerks of the accounting firm, no documentation was introduced which could substantiate petitioners' claim that the $ 85,000 note was included in income in 1980. In the absence of such documentation, the testimony of the witnesses, and their credibility, is of critical importance. *536 Gambino v. Commissioner, T.C. Memo. 1986-383. The testimony of Adams, Kofoed, and Teran convinces us that the $ 85,000 Chandler note was included in petitioners' income in 1980. We found Adams, Kofoed, and Teran to be credible witnesses. Kofoed and Teran testified that when they prepared the 1980 and 1981 returns concurrently in 1984 they included the $ 85,000 note in income before it was deducted as a business bad debt. In light of the fact that they had not been fully compensated by petitioners for prior services and it was unlikely that they would receive any personal gain by testifying as they did, Kofoed and Teran can be considered unbiased witnesses. The 1980 and 1981 tax returns were prepared by Kofoed and Teran with the knowledge that the bad debt deduction would most likely be audited. Thus, we accept their testimony that they took extraordinary care in confirming the accuracy of the returns. Petitioners have sustained their burden of establishing an $ 85,000 basis for the bad debt loss. Worthlessness of the Debt
A taxpayer must claim a bad debt deduction in the year it becomes worthless. Sec. 166(a)(1). Worthlessness in a particular year is a question of fact, which *537 the taxpayer has the burden of proving by a preponderance of the evidence. Eagle v. Commissioner, 242 F.2d 635, 637 (5th Cir. 1957); Lunsford v. Commissioner, 212 F.2d 878, 883 (5th Cir. 1954). We hold that petitioners have sustained their burden by proving that the $ 85,000 debt became worthless in 1981 and was properly claimed on their 1981 tax return. The worthlessness of a debt must be determined by "an examination of all the circumstances." Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). Circumstances such as the solvency of the debtor and efforts to collect the debt have been considered in determining the worthlessness of a debt. The insolvency of the debtor standing alone is not proof of the worthlessness of the debt. Rowan v. United States, 219 F.2d 51, 56 (5th Cir. 1955). We must look at all pertinent evidence; legal action to enforce payment is not required. Sec. 1.166-2(a) and (b), Income Tax Regs. In the first instance, the taxpayer is the judge of the worthlessness of a debt. Farmer v. Commissioner, 126 F.2d 542, 543 (10th Cir. 1942). The year of worthlessness of a debt is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning *538 any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981). A taxpayer must prove that on January 1 of the taxable year the debt had some intrinsic or potential value, and that by December 31 the debt had lost all such value. Hubble v. Commissioner, T.C. Memo. 1981-625. However, the taxpayer need not be "an incorrigible optimist." United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927). Here, certain identifiable events occurred in 1981 which demonstrate the worthlessness of the $ 85,000 debt. Petitioners have established that at the beginning of 1981 Chandler would have been able to pay part of the note from income from his drugstore, but at the end of that year petitioners had no hopes to collect on the note. By December 1981, Chandler had closed his drugstore and sold the assets of his business. The sale raised only enough money to pay off a small portion of the debts he owed to secured and unsecured creditors. Further, Chandler had no equity in his home or other assets at the time and he was forced to take a modest-paying job at Hill Air Force Base. In our opinion, petitioners had a reasonable basis for abandoning any hope of collection recovery *539 on the Chandler note. We therefore conclude that petitioners have sustained their burden, by a preponderance of the evidence, that the Chandler note was totally worthless in 1981. Thus, petitioners are entitled to the claimed $ 85,000 business bad debt deduction in 1981. II. Section 6651(a)(1) Addition to Tax
The final issue is whether petitioners are liable for an addition to tax pursuant to section 6651(a)(1). Section 6651(a)(1) imposes an addition to tax upon a taxpayer who fails to file a timely return unless the taxpayer demonstrates that his failure to file was due to reasonable cause and not willful neglect. The term "willful neglect" means a conscious, intentional or reckless indifference. United States v. Boyle, 469 U.S. 241 (1985). "Reasonable cause" is not defined by statute. However, under section 301.6651-1(c)(1) and (2), Proced. & Admin. Regs., in order to manifest "reasonable cause" the taxpayer must show he used "ordinary business care and prudence." Whether the late filing of an income tax return is due to a reasonable cause or willful neglect is a question of fact. Commissioner v. Walker, 326 F.2d 261, 264 (9th Cir. 1964), affg. on this issue 37 T.C. 962 (1962). *540 Apart from the items of potential income being disputed in the litigation with Kimball and Garner, petitioners did not have sufficient income to require the filing of an 1981 tax return. Section 6012(a). In view of the unusual nature of the facts and surrounding circumstances involved in this case, we hold that petitioners' failure to timely file their 1981 Federal income tax return was due to reasonable cause and not to willful neglect. To reflect concessions and our conclusions on the disputed issues, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩