JAMES E. GILBOY AND MAXINE B. GILBOY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gilboy v. Commissioner
Docket No. 696-76
United States Tax Court
T.C. Memo 1978-114; 1978 Tax Ct. Memo LEXIS 402; 37 T.C.M. (CCH) 510; T.C.M. (RIA) 780114; March 22, 1978, Filed James O. Vollmar, for the petitioners. Joseph R. Peters, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency in petitioners' Federal income tax for *404 the calendar year 1969 in the amount of $19,753.81. The issues for decision are: (1) Whether petitioner [1] is entitled to business bad debt deductions under section 166[2] in 1972 for advances to Mayville, a corporation in which petitioner was a shareholder. This issue depends, in part, on whether the advances were loans or capital contributions. (2) Whether petitioner is entitled to business had debt deductions under section 166 for transfers of money in 1972 honoring his guarantee of obligations of Source Plastics, a corporation wholly-owned by petitioner. (3) Whether payments by petitioner in 1972 for interest and attorney fees were expenses incurred in his trade or business, deductible under section 162(a). The relationship of the items in dispute to petitioner's trade or business will determine his entitlement to a net operating loss carryback to 1969 under section 172. *405 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners James E. Gilboy and Maxine B. Gilboy are husband and wife who resided in Oconomowoc, Wisconsin at the time their petition was filed. They filed original and amended joint Federal income tax returns for the calendar years 1969 and 1972 on a cash basis with the Midwest Service Center at Kansas City, Missouri. Since 1955 petitioner has been in business as a manufacturers' representative, operating as James E. Gilboy and Associates, a sole proprietorship. Petitioner sells products of various manufacturers to buyers in Wisconsin, earning commissions paid by the manufacturers he represents. Petitioner has represented copanies involved in the fabrication of steel products and plastics manufacturers. In addition to being a manufacturers' representative, petitioner has at various times been an independent broker selling steel and machinery. During the 1960's, various manufacturers petitioner represented in Wisconsin decided to eliminate petitioner as a sales representative. In most of these *406 instances the manufacturer sold to their customers in Wisconsin by direct contact with the buyer or through the use of their own salaried sales people. The manufacturers lost by petitioner in this manner represented a substantial loss of income. In response to the defections of his manufacturing clients, petitioner decided to develop sources of income over which he could exert some control in the future. Petitioner planned to acquire ownership interests in small manufacturing concerns with the expectation that the combination of lending, leasing, and the holding of equity would provide him the leverage necessary to establish and maintain a status as the exclusive representative for these manufacturing firms. Accordingly, petitioner invested in three small manufacturing companies in Wisconsin that had product lines related to the ones petitioner represented. Mayville Manufacturing Corp. (Mayville) was organized on November 6, 1964 by petitioner and Joseph V. Kelley to engage in a metal stamping and fabrication business. Petitioner contributed $1,000 to Mayville in return for 100 shares of no par value common stock, and Kelley contributed $500 for 50 shares of the stock, resulting *407 in an initial corporate capitalization of $1,500. In November of 1967, Kelley purchased an additional 50 shares of common stock, an amount sufficient to make him a 50 percent owner of Mayville. The purchase price paid by Kelley for these 50 shares was $4,626. Petitioner became the sole shareholder in Mayville in March 1971 by purchasing Kelley's 100 shares of Mayville stock. Prior to that time Mayville was managed by persons other than petitioner, with petitioner's participation in the business limited to his being a director and salesperson. Petitioner received a weekly salary from Mayville beginning in 1967 for representing it in the Wisconsin area. These salary payments to petitioner were in lieu of a percentage of sales commission. The aggregate amounts of gross salary paid to petitioner, beginning at $40 per week and increasing to $100 per week in 1968, were as follows: Year
Gross Salary
1967
$ 2,120
1968
5,240
1969
5,300
1970 *
3,100
Petitioner made cash advances to Mayville at various times during its existence. The dates and amounts of the advances, and whether or not an advance was repaid, *408 are summarized as follows: ADVANCES BY PETITIONER TO MAYVILLE MANUFACTURING CORP. DATE
AMOUNT
PAID UNPAID AS OF JAN. 1972
11/6/64
5,500.00
5,500.00
12/17/64
700.00
700.00
1/21/65
500.00
500.00
4/23/65
300.00
300.00
5/20/65
60 0.00
600.00
5/25/65
2,920.29
2,920.29
12/1/65
250.00
250.00
1/14/66
1,000.00
1,000.00
1/1/66
600.00
600.00 1/29/66
3,000.00
3,000.00
4/6/66
7,500.00
7,500.00
1/31/66
3,250.90
3,250.90
5/1/66
3,000.00
3,000.00
6/1/66
1,300.00
1,300.00
3/10/71
772.53
772.53
31,193.72
20,321.19
10,872.53
Each cash advance to Mayville remaining unpaid in January of 1972 was evidenced by an unsecured promissory note payable on demand to petitioner, and, with the exception of the $600 note, each note was an interest-bearing note. Payments of interest were regularly made by Mayville and reported as income by petitioner with respect to these notes. Petitioner's advance of $5,500 to Mayville on November 6, 1964, the date of Mayville's incorporation, was used as the cash down payment for the purchase of the manufacturing assets from Mayville's predecessor. The remainder of the $12,500 *409 purchase price was a $7,000 note payable to Melvin Strook, who had previously owned and used these assets. This $7,000 obligation was retired by Mayville sometime prior to 1972. The $7,500 advance made by petitioner was a short-term loan that enabled Mayville to purchase a press brake. This purchase was in turn financed through a secured bank loan, with petitioner being promptly repaid by Mayville. A similar procedure of advance and repayment was used by Mayville to purchase a welder. For the most part, however, the corporate use of the proceeds of the advances was not identified.
Mayville became insolvent in January of 1972, and paid its last corporate payroll during that month. On January 10, 1972, a special meeting of the sole shareholder in Mayville authorized the surrender of corporate assets to the State Bank of Mayville and assignment for the benefit of Mayville creditors. Corporate obligations to petitioner in the amount of $10,872.53 remained unpaid. Source Plastics, Inc. was a corporation organized on April 24, 1969 to engage in a plastics molding business. Its incorporation coincided approximately with petitioner's gradual loss of representation of a plastics *410 company, Plasticon Corp., from whose sales petitioner derived substantial commissions. Source Plastics was organized by petitioner, James Henderson, and two other persons pursuant to an arrangement whereby each was to contribute $500 for a quarter interest in the corporation. Source Plastics was, in fact, established with an initial capitalization of $500, paid by petitioner in return for the issuance of 500 shares of no par value common stock. When the other three original organizers each failed to contribute their $500, petitioner became the sole shareholder and director of Source Plastics, while James Henderson became the corporate president responsible for the daily operation of the corporation.
In December of 1969, petitioner forced the closure of Source Plastics due to adverse financial prospects. However, before the interruption of production, petitioner became convinced that the corporation could continue under new management. Accordingly, Wayne Boucher was employed and managed the business until September, 1971. Petitioner's relationship to Source Plastics during its existence was as its owner, the lessor of the principal income-producing assets for the business, and *411 as a salesperson for its products, although petitioner was never paid a salary or sales commission for his representation of the company. Beginning in June 1969, petitioner made numerous cash advances to Source Plastics. Petitioner advanced slightly over $20,000 to Source Plastics for working capital by the time of its temporary closing in December 1969, and over $115,000 by May 31, 1971. In addition, petitioner guaranteed certain obligations of Source Plastics to other creditors. In 1970, petitioner guaranteed an obligation of approximately $12,000 owed to Muehlstein Corp., a supplier of raw materials. Petitioner also guaranteed two loans to Source Plastics by the Peoples Marine Bank of Green Bay in the principal amount of $13,792.72. These bank loans were in the form of notes secured by the accounts receivable of Source Plastics. In December of 1971, Source Plastics filed a voluntary petition in bankruptcy under Chapter XI of the Bankruptcy Act, 11 U.S.C. Sections 701-799. As a result of attempts by Muehlstein Corp. to collect from petitioner under his 1970 guarantee of a Source Plastics' obligation, petitioner in December of 1972 transferred $5,500 *412 to his attorney for possible use in compromising the Muehlstein claim. This money was held in the lawyer's trust account. When early in 1973 it became apparent that no compromise would be reached with Muehlstein, $5,000 was returned to petitioner and $500 was retained as a legal fee by petitioner's attorney. By a letter dated December 29, 1972, the Peoples Marine Bank of Green Bay demanded payment by petitioner on his guarantee of the Source Plastics' obligations as follows: Source Plastics, Inc. has two notes at this Bank of which you are guarantor. As you know, Source Plastics, Inc. is in Bankruptcy. The two notes are past due and are uncollectable less any funds which may be received from the Referee in Bankruptcy when Bankruptcy is terminated. The balance due on principal amounts to $13,792.72, together with interest of $1,097.65 figured to December 29, 1972, plus attorney's fees of $600.00, for a total of $15,490.37. Petitioner satisfied this obligation to the bank with payment by his personal check dated December 29, 1972, in the amount of $15,490.37. In 1975, the Bankruptcy Court transferred in excess of $7,000 to the bank as part of its secured position with *413 respect to Source Plastics. This amount was in turn transferred by the bank to petitioner. Petitioner is also a minority shareholder in a third corporation, Oconomowoc Manufacturing Company (Oconomowoc). Oconomowoc was organized by petitioner and three other persons in 1964 to engage in a commercial bearing business. The petitioner originally represented Oconomowoc, but not as its exclusive representative. This representation was eventually lost by petitioner, largely because he was only a minority shareholder. At the time of trial, there were no outstanding advances to Oconomowoc by petitioner, although a bank held property owned by petitioner as collateral for its loan to Oconomowoc. Petitioner had no sales income from Oconomowoc for the year 1972, or thereafter.
Petitioner paid interest expense in 1972 in the amount of $2,612.95. This amount consisted of interest paid to two banks by petitioner with respect to obligations of James E. Gilboy and Associates. These obligations were incurred for various purposes over several years prior to 1972, including working capital for petitioner's business. Petitioner is unable, however, to identify with specificity the portion of *414 these loans that were used in the trade or business of James E. Gilboy and Associates. In November of 1972, petitioner paid $460.50 for legal advice regarding a proposed section 6672 penalty against petitioner in connection with the failure of Source Plastics to make the required payments of employment taxes withheld for the United States. On his 1972 Federal income tax return, as amended, petitioner reported a net operating loss with respect to his trade or business in the amount of $52,630.89. Contributing to the reported business loss for 1972 were interest payments of $2,612.95 claimed as a business interest expense, the attorney's fee of $460.50 claimed as a business expense, and business bad debts in the amount of $31,862.70. The deductions claimed for business bad debts consisted of the $10,872.53 in advances to Mayville, and payments made with respect to guarantees of Source Plastics for $5,500 (the Muehlstein guarantee) and $15,490.17 [3] (the Peoples Marine Bank guarantee). The net operating loss claimed for 1972 was tentatively allowed as a carryback adjustment to the 1969 calendar year, and petitioner received a tax refund of $32,490.97 for the year 1969. *415 Respondent, in determining petitioner's income tax for 1969, reclassified as itemized deductions not associated with a trade or business the expenses for interest ($2,612.95) and attorney's fees ($460.50) claimed by petitioner in 1972 as business expenses. In addition, respondent disallowed a portion of a business bad debt deduction of $44,276.35 claimed for 1972 by petitioner, the contested items being the $5,500, $15,490.17, and $10,872.53 described above. As a consequence, respondent redetermined the net operating loss for 1972 and reduced the claimed net operating loss carryback deduction to 1969, as tentatively allowed, resulting in a deficiency of $19,753.81 in petitioner's 1969 income tax. OPINION The first issue to be decided is whether petitioner is entitled to deduct as business bad debts under section 166(a), and subject to the net operating loss carryback provisions of section 172, advances to Mayville remaining unpaid when Mayville became insolvent in January 1972. The worthlessness of the advances is not in dispute. Rather, respondent contends that the advances were an equity investment in Mayville whose worthlessness results in a long-term capital loss under *416 section 1211. Alternatively, respondent contends that to the extent any of the advances represent loans which became worthless, such losses are deductible by petitioner only as nonbusiness bad debts under section 166(d). Petitioner, on the other hand, maintains that the advances to Mayville constitute debt, fully deductible against ordinary income as business bad debts upon their worthlessness because the advances were proximately related to petitioner's trade or business of being a manufacturers' representative. We turn initially to the question of whether the advances to Mayville were loans or contributions to capital. The characterization of advances to a corporation by its shareholders as debt or equity is a question of fact on which the petitioner has the burden of proof. See Gilbert v. Commissioner,262 F.2d 512, 514 (2d Cir. 1959), cert. denied 359 U.S. 1002 (1959), affirming a Memorandum Opinion of this Court; Yale Avenue Corp. v. Commissioner,58 T.C. 1062, 1073 (1972). In attempting to deal with this problem of characterization, a number of criteria have been isolated to evaluate the true nature or substance of an investment *417 which is in form a debt.[4] However, no single criterion nor any series of criteria can provide a conclusive answer to whether advances are loans. See John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Therefore, the various factors considered in the numerous cases on this issue are merely aids in analyzing whether the economic realities of the transaction more nearly resemble a debtor-creditor relationship or that of an investor providing risk capital subject to the fortunes of the corporate venture. Gilbert v. Commissioner,248 F.2d 399, 406 (2d Cir. 1957), remanding a Memorandum Opinion of this Court; Helvering v. Richmond, F. & P.R. Co.,90 F.2d 971, 974 (4th Cir. 1937), affg. 33 B.T.A. 895 (1936). *418 Factors which are of particular significance in determining the economic reality of shareholder advances include the capitalization of the corporation (debt-equity ratios), use of the funds advanced, potential sources of repayment and the concomitant risk of nonpayment, and comparability with loans by independent creditors. See Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, 503-537 (1971); Scriptomatic, Inc. v. United States,397 F. Supp. 753 (E.D. Pa. 1975), affd. 555 F.2d 364 (3d Cir. 1977). After applying the above factors to the record before us, we conclude that the $5,500 advance made November 6, 1964 represented an equity investment, but that the four other advances remaining unpaid in January 1972 totalling $5,372.53 (hereinafter the four advances) are properly characterized as loans to Mayville. The $5,500 advance was made contemporaneously with the formation of Mayville. It was evidenced by an unsecured interest bearing promissory note payable on demand to petitioner. The amount of $5,500 was needed by Mayville as a cash down payment for the acquisition *419 of the manufacturing equipment that was indispensable to Mayville's business activity. These facts indicate that the $1,500 initial cash was inadequate capitalization for this corporation, an unproven business, and the $5,500 was required if Mayville was to begin operation. Moreover, it was inevitable that additional funds, or credit, would be needed to meet the working capital requirements of the business. [5] Repayment of the $5,500 could not realistically be expected from Mayville for some period of time, and under these circumstances no prudent independent lender would have made a comparable unsecured loan. Consequently, the $5,500 was placed at the risk of the business and repayment depended upon the success of the venture. See Northeastern Consolidated Co. v. United States,279 F. Supp. 592, 595 (N.D. Ill. 1967), affd. 406 F. 2d 76 (7th Cir. 1969), cert. denied 396 U.S. 819 (1969); Arlington Park Jockey Club v. Sauber,262 F. 2d 902 (7th Cir. 1959). *420 It is a different matter with respect to the other four advances. These advances were made after the incorporation of Mayville, at times when the business had some history of operations on which reasonable hope of success could be based. Each of the four advances was considerably smaller in amount than the $5,500 advanced in 1964 and was undoubtedly made in response to some specific immediate short-term need of Mayville for cash. Beginning in early 1966, Mayville was able to secure bank financing for its more permanent capital needs. Moreover, these four advances were merely part of a continuing series of short-term advances by petitioner that were ordinarily repaid in full. In these respects the four advances were clearly distinguishable from the $5,500 advance. Also, there was a very reasonable expectation of repayment when the four advances were made. Petitioner contends that the intent of the parties to create debt is the controlling factor in resolving the debt-equity question. He contends that several incidents of a formal debtor-creditor relationship require a finding that all the advances to Mayville were debt. These incidents include the existence of interest *421 bearing notes to evidence the advances; the payment of interest on these notes, and the reporting of the interest as income; and the treatment in both corporate and individual books and records of the advances as debt.We reject this argument. It is well settled that the label or name given shareholder advances is some evidence of their character, but it is not decisive. See A. R. Lantz Co., Inc. v. United States,424 F.2d 1330, 1333-34 (9th Cir. 1970); Charter Wire, Inc. v. United States,309 F.2d 878 (7th Cir. 1962); Motel Corp. v. Commissioner,54 T.C. 1433, 1436 (1970). Where closely-held corporations are involved, advances to that corporation by its shareholders are given close scrutiny. The absence of arm's-length dealing provides the opportunity to contrive a fictional debt shielding the real essence of the transaction and obtaining benefits unintended by the statute. We are therefore not precluded by the form of the transaction from inquiring into its substance.See Gilbert v. Commissioner,248 F. 2d 399, 404-06 (2d Cir. 1957), *422 remanding a Memorandum Opinion of this Court. In our opinion the factors discussed above clearly indicate the equity character of the $5,500 advance. Additionally, the $5,500 advance was never repaid, even though over $20,000 in advances made subsequent to it were repaid. Considered together, all of these factors constitute strong evidence that the $5,500 advance was put at the risk of the business. The formal characteristics of debt surrounding the $5,500 advance are insufficient to overcome these indicia of equity. Accordingly, we hold that the $5,500 advance by petitoner was a contribution to capital, [6] but that the other four advances did constitute debt. *423 Having concluded that the four advances were properly characterized as debt, we must now determine whether the loss incurred in 1972 from their worthlessness was deductible as a business or nonbusiness bad debt. In order to qualify as a business bad debt deduction, [7] petitioner must show that he was engaged in a trade or business and that the bad debt was proximately related to it. Section 1.166-5(b), Income Tax Regs. In determining whether the loss is proximate to his trade or business, rather than his investment interest as a shareholder, business considerations must be the dominant motive for making the loan. The dominant motive test was adopted by the Supreme Court in United States v. Generes,405 U.S. 93, 103 (1972): We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * *424 The determination of petitioner's dominant motive is essentially a factual inquiry, with the burden of proof on petitioner. Smith v. Commissioner,55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). Section 1.166-5, Income Tax Regs. Petitioner contends that the advances to Mayville, as well as the investment itself, were made to advance his business as a manufacturers' representative. He argues that these advances were part of a plan to develop relationships with small Wisconsin manufacturing companies enabling him to represent them to customers. We concluded that petitioner has sustained his burden of proving that his dominant motive for making the four advances to Mayville was related to his business of representing manufacturers. Prior to the organization of Mayville in late 1964, petitioner had developed a profitable business of representing manufacturers in certain product lines. His income depended upon the continued successful representation of these companies. One of the hazards of such a business, however, *425 was the desire of these small manufacturing companies to eliminate petitioner's service as a cost of their sales once the relationship with a particular buyer had been established. In response to this problem, petitioner invested in, and made advances to, Mayville and Oconomowoc, both small manufacturing companies organized by petitioner and others. The four advances to Mayville at issue were made in order to obtain income from the sale of their products as an exclusive sales agent. Petitioner was a refreshingly candid witness. We have confidence in the integrity of his clear and straight forward testimony on this point, which we find entirely consistent with the record before us. The respondent argues that the dominant motive for the loans to Mayville could not have been based on business considerations. He reasons that petitioner was the major shareholder of Mayville when the advances were made so that he could exercise control over sales in any event. Also, since three of the four advances were made prior to the payment of any salary to petitioner by Mayville, respondent asserts that petitioner could not be protecting employment income. It is our view that the dominant *426 motivation for petitioner's loans to Mayville was the expectation of sales commissions, or salary payments in lieu of such commissions. While it is true that petitioner was the majority shareholder when the advances were made, that was intended to be a temporary situation. Also, petitioner avoided involvement in the day-to-day management of Mayville, until late in 1971 when adverse financial circumstances forced him to become involved in running the business, in order to concentrate on his sales activities representing manufacturers--including Mayville. When these factors are considered together with the propensity for loss of clientele in petitioner's business, we are convinced that the dominant motive for the four advances was to promote petitioner's business as a manufacturers' representative. [8] As a result, we hold that petitioner is entitled to a business bad debt deduction under section 166 for the losses suffered in connection with the four advances. *427 The next issue involves two guarantees by petitioner of obligations of Source Plastics. Petitioner claimed a business bad debt deduction with respect to transfers of money by petitioner in 1972 to discharge his obligations as guarantor of two Source Plastics debts. Respondent has disallowed the deduction in each instance on the ground that petitioner has failed to establish the "realization of a loss." Respondent asserts that the $15,490.37 debt of Source Plastics was not proved worthless in 1972, and that petitioner did not make any payment in 1972 with respect to the Muehlstein guarantee and could therefore sustain no loss. We agree with respondent. The $15,490.37 transferred to the Peoples Marine Bank was pursuant to its demand that petitioner honor his guarantee of the Source Plastics' obligations. Generally, losses sustained by a guarantor on a worthless debt are deductible under section 166. Putnam v. Commissioner,352 U.S. 82 (1956); Horne v. Commissioner,59 T.C. 319 (1972), affd. 523 F.2d 1363 (9th Cir. 1975). Section 166 *428 distinguishes between business bad debts and nonbusiness bad debts, the latter being deductible only as a short term capital loss. See section 166(d). Petitioner's claim to a net operating loss carryback depends on a showing that his guarantee of the Source Plastics obligation, or the loss incurred from the worthlessness of the debt to which he was subrogated, was proximately related to his business. Section 172(d)(4). Additionally, petitioner must prove the worthlessness in 1972 of the obligation of Source Plastics to which he was subrogated. He has not sustained his burden of proof on either count. Source Plastics was organized in April of 1969. Petitioner, the sole stockholder, contributed $500 for his stock. By the end of 1969, the corporation was forced to temporarily close down operations, although over the 8-month period of its existence, petitioner had advanced over $20,000 for working capital. Petitioner guaranteed the two loans (totaling $13,792.72) to Source Plastics in 1970, and aside from the guarantees, had advanced over $115,000 by the beginning of June 1971. Petitioner was never paid any salary nor did he ever receive any commission income from Source Plastics. *429 Petitioner's concern about commission income played no significant role in his investment in Source Plastics. The large size of the advances over a 2-year period are wholly disproportionate to any commission income petitioner might hope to receive.When, if, and how much commission income petitioner hoped to receive is a matter of speculation on the record before us. At the very least, if petitioner's theory had any validity, he would have to point to some careful calculations with a sharp pencil and we have seen none. On this record, petitioner's loss on the Source Plastics' debt to which he was subrogated cannot be considered as proximately related to his business. See United States v. Generes,405 U.S. 93 (1972); Commissioner v. Standing,259 F.2d 450 (4th Cir. 1958). Petitioner has also failed to prove that the obligation of Source Plastics to which he was subrogated became worthless in 1972. The question of when a debt becomes worthless is one of fact. Petitioner must demonstrate that the debt at issue had some value at the end of 1971 and no value by the end of 1972. Dustin v. Commissioner,53 T.C. 491 (1969), affd. *430 467 F.2d 47 (9th Cir. 1972). In this context, worthless means that the debt lacked both potential and current liquidating value. Normally such proof is met by pointing to some identifiable event that shows the absence of potential value. Dallmeyer v. Commissioner,14 T.C. 1282 (1950). Although the demonstration of an identifiable event is not an absolute prerequisite, a taxpayer must offer some objective evidence of worthlessness; his unsupported opinion will not suffice to sustain his burden of proof. Fox v. Commissioner,50 T.C. 813 (1968), affd.     F.2d     (9th Cir., March 9, 1970, 25 AFTR 2d 70-891, 70-1 USTC par. 9373). After careful consideration of the evidence, we conclude that petitioner has failed to sustain his burden. Petitioner's proof of the worthlessness of the $15,490.37 obligation of Source Plastics consisted principally of two facts: that Source Plastics filed a voluntary petition under Chapter XI of the Bankruptcy Act in December of 1971, and the bank's demand for payment in December of 1972. An adjudication of bankruptcy does not, by itself, justify a bad debt deduction. See Teitelbaum v. Commissioner,294 F.2d 541, 546 (7th Cir. 1961), *431 affirming a Memorandum Opinion of this Court. The demand for payment by the bank shows no more than its unwillingness to wait for a distribution of assets by the trustee in bankruptcy. In addition, the record informs us that the petitioner, when subrogated to the claims of the bank, was in a secured position. In 1975, the Bankruptcy Court transferred more than $7,000 to the bank as part of its secured position with respect to Source Plastics, which was in turn transferred to petitioner. Petitioner thus collected nearly half of the debt he deducted as worthless in 1972, and there is nothing in the record indicating this chain of events was not foreseeable. On the basis of these facts, without more, we are unable to conclude that this $15,490.37 obligation was worthless in 1972. The $5,500 transferred to petitioner's lawyer in December 1972 was for the purpose of effecting the compromise of a Source Plastics obligation which Muehlstein claimed petitioner had guaranteed. The attorney returned $5,000 in 1973, retaining $500 as a legal fee.A cash basis taxpayer, as is petitioner, is not entitled to a deduction for a bad debt until he has made payment and sustained a loss. Cf. *432 Sec. 1.461-1(a)(1), Income Tax Regs. The transfer of money to one's attorney, his agent, under these cirstances is not sufficient relinquishment of control over such money to constitute payment. Accordingly, petitioner's claimed bad debt deduction for this $5,500 was properly disallowed. The final issue is whether amounts paid for interest and attorney's fees in 1972 should be allowed as expenses attributable to petitioner's trade or business, in which event the expenses will increase petitioner's net operating loss carryback to 1969. See section 172(d)(4). Petitioner contends that the interest expense was attributable to loans incurred for the working capital requirements of his business, James E. Gilboy and Associates. However, petitioner conceded at trial that the proceeds of these loans were used for many purposes, including uses nonbusiness in nature. No attempt was made to estimate the amount of interest relating to business use of the loan proceeds. On the basis of the entire record, particularly the financial information that generally describes the nature and extent of petitioner's business and investment activities, we hold that $1,000 of *433 the interest expense involved here is deductible as a business expense. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), affg. 11 B.T.A. 743 (1928). Finally, the legal expense whose deductibility is at issue related to a proposed section 6672 penalty against petitioner. The matter arose from the failure of Source Plastics to make the required payments of employment taxes withheld for the United States. Petitioner contends that this expense related to his business of being a manufacturers' representative. We hold, however, in accord with respondent's position, that this expense is deductible only under section 212. See Sec. 1.212-1(1), Income Tax Regs. As we noted earlier, petitioner's relationship to Source Plastics was essentially as an investor. Therefore, we hold the legal expense, as it relates to an investment in Source Plastics, was not deductible as a business expense. Decision will be entered under Rule 155. Footnotes
1. Maxine B. Gilboy is a party to this proceeding solely by virtue of having filed joint income tax returns with her husband. James E. Gilboy will therefore be referred to herein as petitioner. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
*. Weekly salary discontinued in September 1970.↩
3. Although the amount paid to the bank was $15,490.37, the parties have agreed that the deduction claimed was $15,490.17.↩
4. There are at least 16 separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are: (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provisions of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation. Fin Hay Realty Co. v. United States,398 F.2d 694, 696 (3d Cir. 1968); see also Montclair, Inc. v. Commissioner,318 F.2d 38, 40↩ (5th Cir. 1963), affg. a Memorandum Opinion of this Court.
5. As an immediate source of revenue to satisfy these needs, petitioner points to customers of the previous owner of the manufacturing equipment dependent upon goods manufactured according to specifications unique to this equipment. We are not convinced, however, that these customers represented more than a potential source of orders to Mayville, not an answer to its cash needs.↩
6. Petitioner has asserted that in the event this Court finds that the advances were capital contributions, then an ordinary loss should be allowed under sec. 1244. There are two reasons for rejecting this assertion. First, this issue has not been properly raised by petitioner in the pleadings, by later amendment to the pleadings, but was raised in petitioner's brief for the first time. See Rules 30-41, Tax Court Rules of Practice and Procedure; Markwardt v. Commissioner,64 T.C. 989, 997-98 (1975). Second, were we to consider the issue as properly before the Court, petitioner has not shown that a promissory note, characterized as equity by the Court, was intended to be stock issued by the corporation pursuant to a plan to offer sec. 1244 stock as required by sec. 1244(c)(1)(D). See Morgan v. Commissioner,46 T.C. 878 (1966); Cf. Reddy v. Commissioner,66 T.C. 335, 339↩ (1976).
7. SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. In concluding that the proper measure of the relationship of the bad debt to the taxpayer's trade or business was that of dominant motivation, the Supreme Court in United States v. Generes,405 U.S. 93 (1972), indicated that this standard had the attribute of workability. "It provides a guideline of certainty for the trier of fact. The trier then may compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." Id. at 104. Applying the objective factors in this case, we note that petitioner had advanced slightly over $12,000 ($1,500 original capital, and $10,872.53 in advances, including the $5,500 we have already determined to be equity). A potential annual reward of between $5,000 and $10,000, as evidenced by the salary payments, would seem a reasonable expectation. The magnitude of this reward, relative to the size of the advances, serves to reinforce our conclusion as to petitioner's dominant motivation.↩