JERRY C. BALDWIN and PATRICIA A. BALDWIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baldwin v. Commissioner
Docket No. 315-91
United States Tax Court
T.C. Memo 1993-433; 1993 Tax Ct. Memo LEXIS 444; 66 T.C.M. (CCH) 769; September 16, 1993, Filed Decision will be entered for petitioners. For petitioner: Neil Deininger. For respondent: Kirk S. Chaberski. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1985 in the amount of $ 48,407.89. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues in this case arise out of a claimed net operating loss carryback from 1987 to 1985. That net operating loss carryback, in the amount of $ 148,238, is based upon a bad debt deduction, in the amount of $ 161,483, claimed by petitioner Jerry C. Baldwin on his 1987 individual Federal income tax return. The claimed 1987 bad debt deduction is based upon the alleged worthlessness of a promissory note between petitioner Jerry C. Baldwin and Baldwin Enterprises, Inc. Thus, resolution of the 1985 deficiency depends upon the validity of the claimed 1987 bad debt deduction. [1]
*445 Specifically, the issues for decision are: (1) Whether a bona fide debt of Baldwin Enterprises, Inc., was created in favor of petitioner Jerry C. Baldwin; (2) If a valid debt was created, whether that debt became worthless during the 1987 taxable year; and (3) If the debt became worthless during 1987, whether that debt was a business or a nonbusiness bad debt. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the two supplemental stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Jerry C. Baldwin and Patricia A. Baldwin were husband and wife during the taxable year at issue and resided in Cabot, Arkansas, at the time they filed their petition in this case. All references to petitioner in the singular will be to petitioner Jerry C. Baldwin. Procedural Background
Petitioners timely filed a 1985 joint U.S. Individual Income Tax Return (Form 1040) with the Internal Revenue Service Center in Memphis, Tennessee. [2] That Form 1040 reported, on Schedule E, income from the Baldwin-Odom Enterprises partnership in the amount of $ 258,752. That Form 1040 *446 reflected tax liability in the amount of $ 53,866 and total tax payments of $ 5,795, resulting in tax owed in the amount of $ 48,071. Petitioners did not pay any of this amount owed with the return. Petitioner timely filed his U.S. Individual Income Tax Return (Form 1040) for the 1987 taxable year with the Internal Revenue Service Center in Memphis, Tennessee. See supra note 2. That individual return reported a claimed bad debt deduction in the amount of $ 161,483 on the Schedule C attached thereto. This claimed bad debt deduction resulted from a promissory note, dated September 12, 1985, executed on behalf of Baldwin Enterprises, Inc. (BEI), by petitioner as president of BEI, in favor of petitioner individually. Petitioners' failure to pay the tax due in 1985 created a Federal tax *447 lien in favor of the United States upon all property and rights to property, real and personal, belonging to petitioners individually in accordance with section 6321. On May 22, 1987, the Internal Revenue Service (the IRS) filed a Notice of Federal Tax Lien against petitioners in Lonoke County, Arkansas, in an effort to collect the 1985 income tax due. On April 15, 1988, an IRS revenue officer advised petitioners' counsel that under the Internal Revenue Code the IRS had legal rights of seizure to satisfy this lien and that said rights could include "locking up" the doors of BEI's place of business since petitioner personally owned the realty and building in which BEI conducted its business. On April 25, 1988, petitioner filed an Application for Tentative Refund (Form 1045) with the Internal Revenue Service Center in Memphis, Tennessee. That Form 1045 reflected a claimed net operating loss carryback from 1987 to 1985, relating to the claimed 1987 bad debt deduction. At the time the Form 1045 was filed, petitioners still had not paid the remaining tax shown due on petitioners' 1985 joint tax return. The application for tentative refund requested that the tentative refund be applied *448 to the balance due on the 1985 return. On June 20, 1988, respondent issued a credit to the 1985 Federal income tax due from petitioners in the amount of $ 48,407.89, in accordance with the Form 1045. On October 3, 1990, the statutory notice of deficiency, on which this case is based, was issued to petitioners for the 1985 taxable year. Respondent determined that the Application for Tentative Refund was without merit and determined a deficiency in an amount equal to the credit amount previously allowed, $ 48,407.89. On that same date, a statutory notice of deficiency was issued to petitioner for his 1987 taxable year. Respondent determined that the net operating loss claimed by petitioner on his 1987 individual return was not allowable under section 166 and determined a deficiency of $ 567 due from petitioner for that taxable year. Petitioner did not file a petition with this Court for redetermination of the 1987 deficiency within the time specified by section 6213(a), but he has filed a timely petition for the redetermination of the 1985 tax liability. See supra note 1. Satellite Dish Antenna Business
In January of 1985, petitioner and Randall Odom (Odom) pooled *449 their knowledge and certain resources to manufacture and sell satellite dish antennas. Odom provided $ 20,000 in cash and petitioner provided certain equipment. They formed Baldwin-Odom Enterprises, an Arkansas general partnership (the Partnership). There was no written agreement between petitioner and Odom. Odom had a substantial business in another city and devoted the majority of his time to that business. Petitioner devoted all of his time to the satellite dish antenna business, and the business became an overnight success. That particular area of Arkansas had many skilled welders and was known as the Detroit of satellite dish manufacturers. In August of 1985, petitioner and Odom informally decided to change their oral agreement. Petitioner desired to acquire Odom's interest in the Partnership. Odom agreed, providing certain conditions were met. First, Odom wished to be released from all liabilities as a partner. Second, he wanted to be repaid his original $ 20,000 investment in the Partnership plus an additional $ 50,000. Last, he requested that three of the employees of the business (Wayne Besancon, Jerry Ross, and Steve Lang) receive a combined 25-percent ownership *450 interest in the business. There were no written documents defining the relationships of these men to the business, except for an employment contract between Wayne Besancon and the Partnership. Subsequent to the formation of the Partnership but prior to September 11, 1985, the end of the Partnership's first and only taxable year, 75 percent of the profit, loss, and capital interests in the Partnership was held by petitioner and 15 percent by Wayne Besancon, 5 percent by Jerry Ross, and 5 percent by Steve Lang. The Partnership timely filed a U.S. Partnership Return of Income (Form 1065) for the period January 1, 1985, through September 11, 1985, with the Internal Revenue Service Center in Memphis, Tennessee. The Partnership had ordinary income of $ 345,003.01. On the Schedule K-1 for petitioner attached to the Partnership's 1985 return, petitioner's distributive share of partnership ordinary income ($ 258,752.26) less distributive share of deductions for section 179 recovery property ($ 557.11) resulted in net earnings from self-employment in the amount of $ 258,195.15. On petitioners' joint return for 1985, $ 258,195 was reported as petitioner's net income from the Partnership. *451 Petitioner actually received a cash distribution of about $ 40,000 to $ 50,000 of that amount from the Partnership in 1985. In addition, in 1985, petitioners reported income from sources [3] other than the partnership distributive share, including $ 9,721.19 ($ 6,100 to petitioner and $ 3,621.19 to Mrs. Baldwin) of salary from the newly formed corporation, to be discussed below. Incorporation of Baldwin Enterprises, Inc.
In August of 1985, petitioner consulted with his accountant, Calvin K. Aldridge (Aldridge), regarding the business structure of the Partnership. Due to the rapid success of the satellite dish antenna business, petitioner had become concerned about his personal tax liability *452 for undistributed earnings of the Partnership. In a memorandum dated August 7, 1985, Aldridge advised petitioner to consider incorporating the Partnership. He outlined the advantages and disadvantages of incorporation. He specifically suggested two approaches for consideration: one approach would be to transfer all of the assets used in the Partnership to the corporation, while the other approach involved transferring only inventory, receivables, and payables. Before discussing the various options with Aldridge, petitioner asked a lawyer to set up a corporation and that was done. [4]
*453 On September 12, 1985, petitioner, as the sole incorporator, caused Baldwin Enterprises, Inc. (BEI or the corporation), to be incorporated under the laws of the State of Arkansas. Ultimately, all partnership assets were transferred to BEI, and BEI continued the satellite dish antenna business of the Partnership after incorporation. At the first meeting of the board of directors, petitioner was elected president of BEI, Wayne Besancon vice president, and Patricia Baldwin secretary/treasurer as of September 12, 1985. At that meeting, the board of directors authorized and directed petitioner, as president, and the corporate secretary to issue $ 1 par value common stock to the Partnership in exchange for the Partnership's contribution of all of its assets to BEI. [5]The board of directors further understood that the Partnership would distribute the BEI common stock to its partners in a liquidating distribution in accordance with the partners' proportionate shares of the Partnership, resulting in 150 shares to petitioner, 30 shares to Besancon, 10 shares to Ross, and 10 shares to Lang. Thus, the initial shareholders in BEI were identical to the "final" partners in the Partnership, *454 i.e., petitioner, Besancon, Ross, and Lang. Each shareholder's initial equity interest in BEI was proportionate to his respective partnership interest. BEI's Issuance of Notes to the Shareholders
Petitioner's reason for incorporating the Partnership was to avoid future personal tax liability for undistributed future earnings of the satellite dish antenna business. At the time of incorporation, *455 petitioner reasonably expected the high earnings from the sale of satellite dishes to continue. Aldridge suggested that, after incorporating, petitioner establish a nominal salary with a bonus arrangement, so that the bonus would not be received or taxed until 1986 and could be used to pay the taxes on the large amount of undistributed partnership earnings from the 1985 operations. Aldridge recognized the economic burden that the flow-through nature of partnerships presented for petitioner and the other partners and brought this matter to the attention of petitioner's tax counsel in a memorandum dated October 18, 1985. Aldridge pointed out that part of petitioner's interest in the Partnership (the undistributed earnings) could be structured as debt rather than equity in the corporation: Since the partners will have paid income tax on their equity to be transferred to the corporation, to what extent would tax counsel advise classifying it as debt as opposed to equity to enable the shareholders to withdraw cash in repayment of the debt. What type of debt instruments should be prepared?
Petitioner left to his legal counsel and accountant the decision as to how much of *456 that right to payment of undistributed partnership earnings he should risk as a capital investment in the new corporation and how much he should treat as debt that the corporation would be obligated to repay. Legal counsel decided upon a debt-equity ratio of 3 to 1. Accordingly, the transfer from the Partnership to BEI, representing petitioner's basis in his partnership interest of $ 216,302.89, was designated as $ 161,482.93 unsecured debt (evidenced by a promissory note) and as stock with a basis of $ 54,819.96. This promissory note was shown as a shareholder loan on the corporate books. The profits of the Partnership at the time of incorporation were tied up principally in accounts receivable and inventory. Petitioner did not expect this situation to continue, however, and expected continuing sales and payments, thereby freeing cash for payment of salaries, bonuses, and the interest payments that would become due on the shareholders' promissory notes. As stated, above, the corporation's obligation to petitioner was evidenced in the form of a promissory note in the amount of $ 161,482.93 (the Note). The Note was executed sometime after October 18, 1985, but was dated September *457 12, 1985, the date of incorporation. [6] The Note states that the entire principal amount is due in full on September 12, 1995, and provides for BEI's payment of interest at a rate of 10 percent per annum to petitioner. The Note provides that a failure of BEI to pay interest to petitioner pursuant to the terms of the Note would constitute a default by BEI. The Note was unsecured by any assets of BEI and was treated as subordinate to all other corporate debts. BEI could not have secured a loan from a third-party lender under the same terms as those reflected in the Note. Petitioner admitted that he himself would not have made such a loan to BEI if he were not in control of the corporation. *458 No payments of interest or principal were ever made by BEI to petitioner. The failure to BEI to pay interest to petitioner pursuant to the terms of the Note constituted a default by BEI under the terms of the Note. Despite this default, petitioner never made formal demand for payment pursuant to the terms of the Note, nor did he take any action in an attempt to enforce the Note. Petitioner concluded that to do so would have been futile. Nevertheless, petitioner also did not release BEI from its obligation to him with respect to the Note. Petitioner, as president of BEI, also executed promissory notes to each of the other three corporate shareholders: $ 59,166.40 to Wayne Besancon, $ 3,979.46 to Jerry Ross, and $ 5,371.21 to Steve Lang. [7] Each note reflects about three-fourths of each shareholder's basis in his Partnership interest, being principally the undistributed partnership earnings. However, Lang and Ross had already received distributions of a good portion of their partnership earnings. *459 In addition to the promissory notes, the shareholders of BEI entered into a shareholders' agreement (the Agreement) on December 30, 1985, restricting each shareholder's ability to sell his stock in the corporation. The Agreement specifically provided that petitioner could not sell his stock without the prior written consent of BEI and all of the other shareholders, or, in the absence of written consent, without complying with certain terms and conditions. Besancon, Ross, and Lang agreed not to sell their stock to outsiders under any circumstances; however, if any one of them left the employ of the corporation, for whatever reason, the corporation was obligated to buy his stock. BEI's Financial Difficulties
Commencing in January of 1986, only 5 months after the incorporation of the business, BEI suddenly and unexpectedly began to suffer sharply reduced demand for its products as a result of satellite signal scrambling. Signal scrambling by various cable television stations virtually eliminated demand for satellite dish antennas: the price charged for descrambling equipment made it prohibitively expensive to acquire both a satellite dish and a descrambler. Also the descrambler *460 or decoding devices were not readily available at the time, so demand for the satellite dishes suddenly plummeted some 70 to 75 percent. Further difficulties arose because BEI had trouble collecting its accounts receivable. Many of the retailers to whom the Partnership and later the corporation had sold satellite dishes filed for bankruptcy or otherwise failed to pay their accounts. BEI's market for satellite dish antennas had virtually disappeared overnight. Petitioner clung to the hope, however, that congressional legislation would rectify the difficulties caused by the signal scrambling. BEI and several other satellite dish manufacturers formed the National Satellite Alliance, a nonprofit organization designed to "inform the public of the tremendous value that still remains in owning a home [satellite dish] system". Petitioner continued to clutch at these and other vain hopes of reviving the corporation's business well beyond a reasonable period of time. At the height of its business BEI had 83 employees. In February of 1986, 55 of them were laid off. Competitors were scrambling for any remaining business, and many satellite dish manufacturers were falling by the wayside. *461 During this downturn in business, petitioner redeemed the other shareholders' interests and terminated their services because there was not enough money in the corporation to pay them. In September of 1986, the corporation did not make any interest payments on the shareholders' notes when interest became due, nor did BEI make any subsequently due interest payments. Prior to that first interest payment due date, BEI, petitioner, and Wayne Besancon, on July 1, 1986, entered into an agreement for the purchase of Besancon's ownership interest in BEI for $ 55,000. [8]The corporation issued a promissory note to Besancon for the sum of $ 47,081, to be paid in monthly installments of $ 1,000. These installments commenced January 15, 1987, and were to continue until July 15, 1987, at which time, the balance of the note would be due in full. Petitioner personally guaranteed the note. *462 On October 20, 1986, BEI, petitioner, and Jerry Ross entered into an agreement for the purchase of Ross's ownership interest in BEI for $ 2,500. Petitioner agreed to personally guarantee BEI's promissory note for this purchase. On January 13, 1987, BEI, petitioner, and Steve Lang entered into an agreement for the purchase of Lang's ownership interest in BEI and to satisfy all of his outstanding creditor claims against the corporation, including but not limited to the note dated September 12, 1985. Lang did not receive any cash for this agreement because he owed money to the corporation, offsetting the amount he would have been paid for his stock and note. Soon thereafter, Besancon began threatening lawsuits and foreclosure on the real estate used to secure payment for his interest. Petitioner had to pay Besancon in order to avoid protracted and costly litigation. On June 2, 1987, petitioner in his individual capacity, not as a representative of BEI, issued a promissory note to Besancon in the amount of $ 48,173.43. The note provided for monthly installments of not less that $ 1,000, commencing June 22, 1987, with the balance of principal and interest being due on December *463 22, 1987. The payment of the note was secured by a mortgage on certain personal property leased to the corporation, upon which there were already outstanding mortgages. In July of 1987, BEI terminated the employment of both Besancon and Lang. By July of 1987, petitioner had become the sole shareholder of the corporation and had full control of the corporation. By the end of 1987, BEI was experiencing severe financial difficulties. The last financial statement ever prepared for BEI was dated in May of 1987. Petitioner's salary from BEI had been $ 6,100 for the period of September 11, 1985, through December 31, 1985, and $ 44,500 for the calendar year 1986, paid only in the period from January through May of 1986. Petitioner drew no salary for the rest of 1986 or for all of 1987 and 1988. Petitioner had to borrow funds from the Bank of Cabot, some $ 50,000 to $ 60,000 in 1986 and an additional $ 35,000 in 1987, to meet basic operating expenses. He had secured those loans by pledging BEI assets as well as his own personal assets. Petitioner, as well as his corporation, was in dire financial straits. [9]
*464 The corporation reported on its tax returns losses of ($ 124,448) for fiscal year ended July 31, 1986 ($ 110,968 after audit), ($ 112,558) for fiscal year ended July 31, 1987, and ($ 66,367) for fiscal year ended July 31, 1988. On July 31, 1987, BEI's debts exceeded its assets by a ratio of 1.66 to 1. Corporate liabilities did decrease somewhat during fiscal year ended July 31, 1988. During 1986, 1987, and 1988, Federal and State tax liens had been placed on corporate assets as well as on petitioner's personal assets. In addition, creditors of BEI obtained judgments against the corporation for outstanding debts. In late 1987 and early 1988, BEI satisfied various liens held by the IRS and caused such liens to be released. [10] However, BEI paid substantial amounts of interest because of the delays in making these employment tax payments. BEI was delinquent on these tax payments for the last three quarters of 1986 and for all of 1987. *465 At the end of 1987, petitioner had a meeting with his counsel and accountant to discuss his options. Petitioner's counsel and Aldridge recommended the filing of bankruptcy. They advised petitioner that it was highly unlikely that he would ever be able to collect on the Note, given all of the outstanding corporate obligations and the liens encumbering corporate and personal property. Petitioner did not think that he would ever be able to profitably operate the corporation or to collect the corporation's debt to him. However, petitioner decided to try to keep the business operating because the outstanding accounts receivable would be even more difficult to collect if the corporation were shut down. Petitioner was also concerned about his personal liability for unpaid employment taxes if the corporation were shut down. He concluded that he had even more to lose by shutting down the corporation. Petitioner had a fierce desire to make a success of the satellite dish antenna business, and doggedly hoped that with more effort and determination on his part he could succeed. Despite the advice of his counsel and accountant, petitioner could not bring himself to swallow the bitter *466 pill of failure. BEI experienced occasional upswings in business and continued to operate until approximately June of 1991. In 1989, petitioner, ever hopeful, informed one of the corporation's creditors that BEI's business was improving and advised an employee of the taxing authority of the State of Arkansas that BEI intended to pay its State tax obligations in the future. BEI's gross receipts had increased somewhat and losses had declined somewhat during the taxable year ended July 31, 1988, as compared to its prior taxable year. BEI's corporate liabilities had decreased during its taxable year ended July 31, 1988, as compared to its prior taxable year. BEI entered into payment agreements with the IRS subsequent to December 31, 1987. Nevertheless, despite petitioner's determination and hard work and these relative improvements, the corporation's debts still exceeded assets throughout its operations. Any modest upswings were short lived, and BEI finally ceased operations on or about June 30, 1991. BEI had losses for each of the years it was in operation. OPINION The issue is whether petitioner is entitled to a net operating loss carryback from 1987 to 1985. The answer to *467 this question depends upon whether petitioner is entitled, under section 166(a), to a business bad debt deduction in 1987. That bad debt deduction stems from his advance to his corporation evidenced by a promissory note that has never been paid. Respondent contends that the advance was an equity investment in the corporation. [11] Alternatively, respondent contends that, if the advance were to be considered a loan, the debt cannot be considered to have been worthless in 1987. Respondent further contends that, even if considered worthless at that time, such a loss would be deductible by petitioner only as a nonbusiness bad debt under section 166(d). *468 Petitioner, on the other hand, maintains that the advance to the corporation constituted a bona fide debt, that the debt became worthless in 1987, and that the bad debt is fully deductible against ordinary income as a business bad debt. Section 166 allows a deduction for any bad debt which becomes worthless during the taxable year. However, section 166 distinguishes business bad debts from nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income and are deductible whether wholly or only partially worthless during the year. Nonbusiness bad debts may be deducted, but only in the same manner as short-term capital losses and only if they are entirely worthless in the year claimed. Sec. 166(d). 1. Debt v. Equity
Only a bona fide debt qualifies for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. This regulation defines a bona fide debt as one that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A contribution to capital is not considered to be debt for purposes of section 166. Sec. 1.166-1(c), Income Tax *469 Regs.; United States v. Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976). Characterization of advances to a corporation as either loans or capital contributions must be based upon all of the evidence in the record, with the burden of proof upon petitioner to establish that the advances were loans. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). Furthermore, advances to a closely held corporation by its shareholders are subject to particular scrutiny: "The absence of arm's-length dealing provides the opportunity to contrive a fictional debt shielding the real essence of the transaction and obtaining benefits unintended by the statute." Gilboy v. Commissioner, T.C. Memo. 1978-114, 37 T.C.M. 510, 515, 49 P-H Memo T.C. par. 78,114 at 78-513 (1978). Thus, we will look beyond the form of the transaction to determine the true substance of the transaction. Id.
Courts have identified and considered various factors in deciding questions of debt versus equity. United States v. Uneco, Inc., 532 F.2d at 1207-1208 (10 *470 factors); Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) (13 factors); In re Indian Lake Estates, Inc., 448 F.2d 574, 578-579 (5th Cir. 1971) (13 factors); Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968) (16 factors). Each factor is not equally significant, nor is any one factor determinative. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); Estate of Mixon v. Commissioner, supra. Moreover, each unique fact situation dictates the relevancy of various factors. "The 'real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice.'" Dixie Dairies Corp. v. Commissioner, 74 T.C. at 494 (quoting Estate of Mixon v. United States, supra at 403). This Court considers the ultimate question to be "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" *471 Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). The Court of Appeals for the Eighth Circuit, to which an appeal in this case would lie, has applied the following objective factors: (1) whether the corporation was so grossly undercapitalized that the loan was in fact needed for capital purposes and was actually intended to be risked capital rather than a loan; (2) whether the purported loan was made in proportion to equity holdings; (3) whether the repayment of the loan was predicated on the success of the venture; (4) whether there was a fixed date for payment of the note and a reasonable expectation of payment by that date; (5) whether the note was subordinated to other corporate debts; (6) whether third parties would have made the loan under the same conditions; (7) whether the claimed loan was secured by a mortgage or otherwise; (8) whether a provision was made for a sinking fund to retire the loan; (9) whether the person making the purported loan participated in the management of the corporation; and (10) whether the corporation had a large proportion of debt to equity. United States v. Uneco, Inc., 532 F.2d at 1208. *472 The Supreme Court recognizes that: There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts.
John Kelley Co. v. Commissioner, 326 U.S. at 530. Thus, we must carefully consider and balance the factors that support opposing conclusions. Ultimately, however, we must decide whether petitioner had a genuine intention to create a debt, with a reasonable expectation of repayment regardless of the success of BEI, or whether his advance was put at the risk of the corporate venture. We look at the transaction as of the time the satellite dish antenna business was incorporated and the promissory notes were issued in 1985 and not as of January 1986 when the industry suddenly and unexpectedly collapsed. Based upon all of the evidence presented in this case regarding the economic reality of the situation at the time the capital structure of the new corporation was determined and the intention of petitioner at that time, we conclude that petitioner's advance to the corporation was a loan rather than a capital contribution. A mechanical application *473 of the 10 objective factors as set forth by the Court of Appeals for the Eighth Circuit in United States v. Uneco, Inc., supra, may not lead to a clear indication of the nature of the advance in this case. We note that the issue before the Eighth Circuit was whether the District Court had applied a proper legal standard. The District Court had held that the taxpayer's subjective intention to create a debtor-creditor relationship was controlling regardless of the economic realities. The Eighth Circuit reversed, holding that all of the factors, including subjective intention, must be considered. We consider all of those factors and all of the facts in the record in context. The context here is important. The satellite dish antenna business had been in operation in partnership form for only 8 or 9 months and had become an overnight success. The partnership profits were very large, petitioner's distributive share being over $ 250,000. Petitioner became acutely aware that he was taxable on those partnership earnings whether or not any cash was distributed to him. Petitioner's reason for incorporating the partnership business was to avoid personal *474 tax liability for undistributed future profits of the business. Petitioner knew he could not avoid the income tax on his distributive share of the 1985 partnership earnings, but when all partnership assets, composed largely of those undistributed partnership earnings, were transferred to the corporation, petitioner had a choice whether to contribute all or only a part of his interest in the partnership to capital. On advice of the tax counsel and accountant, the partners agreed to contribute only part of their interest in the partnership as an equity investment (capital) in the corporation and the rest as loans to the new corporation. At the time the loans were made, petitioner reasonably believed that the high level of profits would continue and that the corporation would generate sufficient earnings to pay high salaries and to pay the interest and principal of the promissory notes. The virtual collapse of the industry that occurred just 5 months after incorporation was sudden and unexpected. [12]
*475 The corporation had a debt to equity ratio of 3 to 1. Considering that the partnership business was initially capitalized with a small amount of capital, the success of the business was dependent on the skilled welders found in that area, petitioner's salesmanship, and accessibility to satellite signals rather than infusions of capital. The brisk sales promised a good cash flow in the future. Therefore, we think the corporation was adequately capitalized, and a debt to equity ratio of 3 to 1 was reasonable under the circumstances. The stockholders' loans were made in proportion to their stock holdings in the corporation. Under the circumstances in this case, however, we do not think the proportionate holdings indicate equity investment in the corporation, but rather reflect the fact that the stockholders, former partners in the partnership, were already liable for tax on the undistributed income of the partnership. While they wanted the new corporation to have the use of their partnership profits, they wanted to be able to get some of that money back from the corporation as loan repayments without again paying tax on the same amount. In other words the partners wanted to contribute *476 some of their partnership earnings to the corporation as equity and to advance the rest as loans to the corporation. Under all of the facts and circumstances then known to the partners, that was a reasonable decision based on the economic realities then evident. The corporation's obligation to repay the loans was unconditional. Repayment was not tied to corporate profits or excused in the event of corporate losses. Petitioner's risk with regard to the loan was the same as any other unsecured general creditor of the corporation. The promissory notes required that interest at the rate of 10 percent per annum be paid annually on September 12 and that the principal be paid in full on September 12, 1995. Thus, the notes called for payments of interest and principal on fixed dates. Furthermore, at the time of incorporation, the business had been successfully operating through the partnership and petitioner reasonably expected the success to continue. At that time, he reasonably expected that interest payments as well as principal payment would be timely made. Some of the objective factors may suggest that petitioner's advance to the corporation was a capital contribution. The *477 loans of the new shareholders to the corporation were made in proportion to their equity holdings. The corporation had established a 3 to 1 debt to equity ratio, and each shareholder held debt and equity roughly in that proportion (with some adjustments to reflect actual partnership distributions). The loans were unsecured and considered subordinated to other corporate debts. Petitioner testified that third parties would not have made loans to the corporation under the same conditions, and that he would not have made such loans if he had not controlled the corporation. Although the corporation did not pay interest when due, which constituted an event of default, petitioner never made a demand for payment. Of course, by that time, petitioner knew there was no longer any money available with which to make such payments. Petitioner not only participated in the management of the corporation but "controlled the checkbook" of the corporation. He stated that he expected to be the last creditor of the corporation paid. However, the fact remains that when the transaction took place, there was a reasonable expectation that the notes would be paid. It is only with the benefit of hindsight *478 that these "objective" factors may suggest that more of the partnership earnings needed to be placed at the risk of the corporate venture. However, the objective factors must be considered in light of the economic reality of the situation at the relevant time and petitioner's intention at that time. We found petitioner and Aldridge to be credible witnesses, and we conclude that their presentation of the facts best reflects the reality of the situation. Each shareholder received proportionate shares of debt and equity because the debt represented a portion of the partnership income allocated to each partner on the 1985 partnership return. Each partner incurred a current ordinary income tax liability for that 1985 income whether or not he actually received the money -- this flow-through nature of partnerships was one of the reasons prompting incorporation. The corporation was not undercapitalized and was not seeking additional financing from other sources at the time of its incorporation. The shareholders of the business expected the corporation to continue its brisk level of sales and thereby expected the corporation to be able to make the yearly interest payments and the principal *479 payment provided for in the notes. The fact that the demand for satellite dishes declined precipitously soon thereafter due to unforeseen circumstances should not draw attention away from petitioner's intention to create a bona fide debtor-creditor relationship with his corporation at its formation. His intention comported with the economic realities at that time. In effect, the debt represented the corporation's obligation to repay the retained partnership income previously taxed to petitioner and the other former partners/current shareholders. As Aldridge recognized and questioned in his October of 1985 memorandum to tax counsel, petitioner incurred in 1985 an ordinary income tax liability for his share of partnership income, which income was in excess of $ 250,000. Yet, petitioner had received a partnership cash distribution of only $ 40,000 to $ 50,000: the rest was transferred to the newly formed corporation. The Partnership had been so successful in its 9 months of operation, with no foreseeable declines at this point in time, that petitioner was not concerned with repayment of the advance in the short term. At the time of incorporation, it was not unreasonable for petitioner *480 to agree to a long-term debt instrument, with payment of principal in 10 years, and a nominal salary, with the expectation of large bonuses, because the economic reality at the time indicated that the business would continue to be successful and profitable. Unfortunately the economic realities changed in this case, suddenly and unexpectedly. For all of the above reasons, we conclude that a bona fide debtor-creditor relationship was created between petitioner and BEI and that petitioner's $ 161,482.93 advance to the corporation constituted debt. 2. Worthlessness in 1987
Having determined that the advance was properly characterized as debt, we must now determine whether the debt became worthless in 1987. The question of worthlessness is a factual one. Petitioner must demonstrate that the debt at issue had some value at the end of 1986 but no value by the end of 1987. Boehm v. Commissioner, 326 U.S. 287 (1945); Dustin v. Commissioner, 53 T.C. 491 (1969), affd. 467 F.2d 47 (9th Cir. 1972). The debt must lack both potential and current liquidating value. Petitioner must show objective *481 evidence of such lack of value; unsupported claims of worthlessness will not be sufficient to sustain his burden of proof. Riss v. Commissioner, 478 F.2d 1160 (8th Cir. 1973), affg. 56 T.C. 388 (1971); Fox v. Commissioner, 50 T.C. 813 (1968), affd. per curiam 70-1 USTC par. 9373, 25 AFTR2d par. 70-891 (9th Cir. 1970); Dallmeyer v. Commissioner, 14 T.C. 1282 (1950). However, we also recognize that petitioner is not capable of predicting the future. Subsequent improvements in business, infusions of capital, or like occurrences do not retroactively create value in the year in which the deduction was taken. Cf. Textron, Inc. v. United States, 561 F.2d 1023 (1st Cir. 1977). If a debt is apparently worthless in the year of deduction, but "the future does not conform to earlier perceptions, and the taxpayer collects the debt * * * Then 'the deductions are practical necessities due to our inability to read the future, and the inclusion of the recovery in income is necessary to offset the deduction'". *482 Hillsboro National Bank v. Commissioner, 460 U.S. 370, 384 n.17 (1983) (quoting South Dakota Concrete Products Co. v. Commissioner, 26 B.T.A. 1429, 1432 (1932)). After careful consideration of the evidence presented in this case, we conclude that petitioner has shown that the debt became worthless in 1987. BEI's financial difficulties began suddenly and unexpectedly in early 1986. The signal scrambling at that time was an unanticipated blow to business projections. The corporation's financial statements indicate that the corporation became insolvent by the end of its 1986 fiscal year, by July 31, 1986. Petitioner received no salary after May of 1986. The corporation had difficulty in paying its employment tax liabilities as well as normal operating expenses incurred in the ordinary course of business. BEI was delinquent in its payments of employment taxes for the last three quarters of calendar year 1986 and for all of calendar year 1987. Yet, petitioner remained hopeful that legislative actions would be taken that would revive the industry and the corporation's sales. However, by the end of calendar year 1987, *483 the situation had become markedly worse. Petitioner drew no salary from the corporation during all of 1987, and the corporation continued to be unable to make full payments of its employment tax liabilities and operating expenses. Petitioner had arranged additional financing for the corporation by pledging corporate assets as well as his own personal assets. As a result, all of BEI's assets were encumbered by security interests. Both Federal and State tax authorities had liens on the corporation's property and on petitioner's property. In addition, several creditor judgments, constituting additional liens against corporate property, were entered against BEI. By the end of calendar year 1987, petitioner's counsel and accountant recommended that the corporation file for bankruptcy protection and advised petitioner that it was unlikely that he would ever be able to collect on the Note. By objective standards, petitioner's loan to BEI had no actual or potential value by the end of calendar year 1987. Furthermore, we find that petitioner has shown that reasonable attempts to collect the debt would have been futile. By having control of the corporation's checkbook, petitioner knew *484 that the secured obligations of the corporation exceeded the property and funds available, thereby rendering his Note realistically without value by the end of 1987. Although the corporation did experience some subsequent occasional upswings in business, it continued to generate overall losses. BEI had net losses during each of the years it was in operation. Therefore, we do not think that petitioner had any reasonable hope of repayment as of the end of 1987. A taxpayer need not be "an incorrigible optimist" with respect to the collection of a debt. United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927). Petitioner kept the corporation in existence only because he thought it would make it easier to try to collect unpaid receivables than if the corporation were shut down. While petitioner could not bring himself to admit that his continued hard work and determination would not change the final outcome, we conclude that all realistic hope for payment of the Note was gone by the end of calendar year 1987. Therefore, we hold that petitioner's debt became worthless in 1987. 3. Business v. Nonbusiness Bad Debt
Finally, *485 we must determine whether the loss incurred by petitioner, resulting from the note's becoming worthless in 1987, is deductible in that year as a business or a nonbusiness bad debt. In order to qualify as a business bad debt, petitioner must show that he was engaged in a trade or business and that the bad debt was proximately related to it. Sec. 1.166-5(b), Income Tax Regs. In determining whether the loss is proximate to his trade or business, rather than his investment interest as a shareholder, business considerations must be the dominant motive for making the loan. United States v. Generes, 405 U.S. 93, 100- 103 (1972). That is to say, we must answer the question as to whether the bad debt proximately related to petitioner's trade or business or to his investment interest as a shareholder. Id.
The determination of petitioner's dominant motivation is a factual inquiry, and that motivation must be determined as of the time the loan was made, not at some subsequent point in time. Cf. United States v. Generes, supra; Stoody v. Commissioner, 66 T.C. 710, 718 (1976). We again *486 find petitioner to have been a credible witness. As we stated above, the potential for success of the corporation's business was dependent upon petitioner's salesmanship rather than capital investment in the corporation. Petitioner expected the corporation to compensate him for his efforts through salary and bonuses. Petitioner reasonably believed the business would continue to have high earnings after incorporation. It is our view that petitioner's dominant motive in making the loan to BEI was securing his salary and bonuses, his previously earned and taxable ordinary income as a partner, and his continuing employment with the corporation. At the time of the loan, petitioner expected that the corporation would continue generating profits and that he would be receiving a salary and substantial bonuses. The salary and bonuses were petitioner's primary sources of income -- the returns petitioner expected from the corporation were those as a direct result of his efforts as an employee of the corporation, not as a shareholder. See Bowers v. Commissioner, 716 F.2d 1047 (4th Cir. 1983), revg. T.C. Memo. 1982-635. Thus, he *487 did not need to make the loan in order to earn interest income or to protect an investment interest but in order to preserve his livelihood. As a result, we hold that petitioner sustained a business bad debt loss in 1987. As a result of these holdings, we conclude that petitioner is entitled to a business bad debt deduction under section 166(a) for the loss he suffered in 1987 in connection with his advance to the corporation. Thus, petitioner is entitled to a net operating loss in 1987, the excess of which carries back to his 3 previous taxable years. Sec. 172(b). Based on the foregoing, Decision will be entered for petitioners. Footnotes
1. It is well settled that this Court may determine the correct amount of a net operating loss for a year not in issue as a preliminary step in making determinations for the taxable year or years at issue. Sec. 6214(b); Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), affd. without published opinion 510 F.2d 970 (3d Cir. 1975); ABKCO Industries, Inc. v. Commissioner, 56 T.C. 1083, 1088-1089 (1971), affd. on other issue 482 F.2d 150 (3d Cir. 1973), and cases cited therein. Another jurisdictional issue was resolved in an earlier opinion in this case. Baldwin v. Commissioner, 97 T.C. 704↩ (1991).
2. Petitioners were divorced soon after the 1985 taxable year. However, they filed a joint income tax return for 1985. Petitioner Jerry C. Baldwin filed individual income tax returns (single filing status) for 1986 and 1987.↩
3. Petitioners had rental income from assets leased to the Partnership and later to the corporation as well as salary income received by Mrs. Baldwin from various jobs. Petitioner had a Schedule C business known as Cabot Industries that manufactured trailers and sleepers. That business reported a loss of $ 27,793 in 1985.↩
4. After setting up a corporation, petitioner placed himself into the hands of Aldridge and a tax lawyer recommended by Aldridge's firm for tax planning and implementation, which then had to be accomplished after the date of incorporation. All documents other than the incorporation papers apparently were prepared sometime after October 18, 1985, and were backdated as of September 12, 1985. Petitioner's seeming reluctance to admit this rather obvious fact on cross-examination, particularly as to the double sets of promissory notes, created an unfortunate impression and generated much argument on brief. The Court concludes that petitioner simply acted precipitately in getting the corporation formed before all the detailed planning had been completed, and then he simply left it to the tax lawyer and accountant to implement and document the transaction. Since the books had to be closed for the Partnership and new books opened for the corporation, a lot of the work necessarily had to be performed after September 12, 1985, in any event. The Court does not draw any adverse inferences from the backdating of these documents. The Court is only concerned as to whether the documents, whenever prepared and executed, accurately reflect the true substance of the transaction.↩
5. Petitioner has characterized that transfer as a tax-free section 351 incorporation. The Partnership had approximately $ 325,752 of net assets to transfer to the corporation. The Partnership had net income of $ 368,820 through August 31, 1985; however, it appears that this amount largely represented accrued but unpaid accounts receivable. After the corporation was formed, collections by the Partnership were deposited into a new bank account in the corporation's name. Thus, the record indicates that all assets of the Partnership, including undistributed partnership earnings, were transferred to the corporation.↩
6. See supra↩ note 4. Petitioner states that the intention that the Note be issued on the date of incorporation existed on the date of incorporation but that such actual issuance was not accomplished because the Partnership's books, specifically setting forth each partner's equity interest, distributive earnings, etc., had not been calculated and closed. Aldridge's memorandum to tax counsel, dated October 18, 1985, suggests the decisions as to structuring the transaction as a sec. 351 incorporation and determining the debt-equity structure of the new corporation were arrived at subsequent to October 18, 1985. While these discrepancies are troubling, the Court is satisfied that this is not a situation where the taxpayer did one thing and his counsel and accountant then tried to characterize the transaction as something different. While the clear outlines of the transaction emerged somewhat slowly here, the Court is satisfied that the form (documentation that was subsequently prepared) essentially comports with the substance of the transaction.
7. Actually, two sets of promissory notes were created for each shareholder, the first representing estimates of the amounts owing to the shareholders from the Partnership and the second representing corrections of the amounts after the year-end accounting review. All of these promissory notes were backdated as of September 12, 1985. See supra↩ notes 4, 6. It apparently took the accountants some period of time to determine the profit allocations and capital balances of each of the partners and to allocate three-fourths to debt (promissory notes) and one-fourth to equity (stock) for each partner. The final analysis of capital accounts and the partnership tax return have yet another figure for Ross and Lang that differs from the figures on either set of their promissory notes. However, the Court views these minor discrepancies as mere accounting details that do not change the basic substance of the transaction.
8. The agreement stated that the partners had received from the corporation stock certificates and 5-year (sic) promissory notes in exchange for their respective proportionate interests in the Partnership. The agreement provided that Besancon assigned to the corporation all his rights, title, and interest in BEI for $ 55,000, to be paid with an $ 8,000 down payment and the balance payable at $ 350 per month and interest at a rate of 13 percent per annum, unless negotiated otherwise.↩
9. In a letter written by petitioner's counsel to an IRS agent in 1988, petitioner requested an abatement of additions to tax for failure to pay which had been assessed against him. In that letter, petitioner's counsel stated that, since the downturn in BEI's business, petitioner had borrowed $ 85,000, using as collateral real property owned by him individually but which was leased to the corporation. In addition, petitioner's counsel stated that petitioner gave security interests in his real property to secure his personal guarantees of corporate indebtedness. Petitioner also relinquished a one-half interest in real property to his ex-wife pursuant to the divorce decree that became final in 1986.↩
10. During the period from 1986 through 1991, BEI filed quarterly Federal Employment Tax Returns (Forms 941). Payment of BEI's tax liability for the second, third, and fourth quarters of 1986 and all quarters of 1987 were delinquent, resulting in filing of Federal tax liens as follows: ↩
Quarter
Form 941
Tax
Payment of Tax
Notice of Federal
Ending
Filed
Liability
Date
Amount
Tax Lien
06/30/86
09/15/86
$ 22,336.03
deposits
$ 2,970.89
09/18/86
5,000
10//86
5,000
filed
01/28/87
05/27/86
6,764.92
08/03/87
5,149.46
released
09/16/87
09/30/86
11/15/86
$ 13,720.04
deposits
$ 7,608.32
filed
02/17/87
08/03/87
850.54
10/26/87
7,213.66
released
02/12/88
12/31/86
03/02/87
$ 10,704.42
deposits
$ 966.80
filed
04/28/87
10/26/87
782.59
11/16/87
8,747.36
01/11/88
2,844.77
released
02/12/88
03/31/87
06/29/87
$ 6,416.71
deposits
$ -0-
filed
09/04/87
01/11/88
1,155.23
02/01/88
6,960.46
released
03/14/88
06/30/87
10/05/87
$ 6,490.71
deposits
$ 1,977.77
none filed
02/01/88
5,611.58
09/30/87
12/07/87
$ 4,524.65
deposits
$ 4,257.23
none filed
12/07/87
267.42
12/31/87
04/04/88
$ 7,869.97
04/04/88
$ 8,656.96
none filed
11. Respondent also calls attention to the fact that the corporation's bylaws provide that no loans shall be contracted on behalf of BEI and no evidence of indebtedness shall be issued in the corporation's name unless authorized by a resolution of the board of directors. Respondent contends that no such resolution was ever passed authorizing BEI to incur indebtedness to petitioner or the other shareholders. Petitioner responds first by calling into question the validity of the bylaws and alternatively by alleging that such a resolution may have been passed but subsequently lost, misplaced, or not otherwise kept in the corporate record book. Although petitioner's explanations are dubious, we do not find this issue to be a critical one in the determination of the existence of a bona fide debt, but merely a factor to be considered among others. This was a small, closely held corporation, and petitioner was not very familiar with much of the documentation and paperwork prepared by his counsel and accountant. See supra↩ notes 4,6,7. That does not however change the basic substance of the transaction.
12. Timing is a critical element in this case. Had the satellite dish antenna business already started deteriorating and had petitioner not reasonably anticipated continued high profits from the business at the time the advances were made, the Court might well have reached a different conclusion in this case. However, the Court believed petitioner's testimony and has concluded that the events unfolded just as he said they did.↩